Mark A. **BRATCHER**, Appellant,

v.

**COMMONWEALTH of Kentucky,**
**Appellee.**

No. 2002–SC–0306–MR.

Supreme Court of Kentucky.

Dec. 16, 2004.

Emily Holt, Dept. of Public Advocacy, Frankfort, for Appellant.

Gregory D. Stumbo, Atty. Gen., Anitria M. Alo, Asst. Atty. Gen., Frankfort, for Appellee.

Opinion of the Court by Justice KELLER.

## I. INTRODUCTION

Appellant was convicted of the intentional murder of Susan Andrew. The jury found the existence of an aggravating circumstance, specifically that the murder was committed for profit, and Appellant was sentenced to life without parole. On this appeal, Appellant raises twelve claims of error. Finding no merit in any of Appellant's allegations of error, we affirm his conviction.

## II. FACTUAL BACKGROUND

Appellant met Susan Andrew while both were working at an Army Hospital in 1992. The two became friends and engaged in an intermittent sexual affair over the next eight years. During this time, Appellant experienced financial difficulties and took steps toward declaring bankruptcy. Ms. Andrew gave Appellant several monetary gifts and named him as a beneficiary on her life insurance policy, although Appellant testified that he was unaware of his status as a beneficiary.

On Thursday, August 26, 1999, Appellant failed to show up at Ms. Andrew's home in Louisville for a scheduled dinner date. Ms. Andrew was upset and told some co-workers that she was no longer going to give Appellant money. Appellant testified that he called Ms. Andrew on Friday morning to apologize, and that she was abrupt and angry with him. Appellant spent the rest of Friday and part of Saturday helping his former wife and their children move.

Appellant was also dating another woman, Melissa Hudson, who lived in Radcliff, Kentucky. In the afternoon of Saturday, August 28, 2000, Ms. Hudson found a cell phone bill in the trash at Appellant's home. She took the cell phone bill and noticed that Appellant had been frequently calling a Louisville phone number, which belonged to Ms. Andrew. Ms. Hudson called the number several times, and then she called Appellant. This touched off a flurry of phone calls among Appellant, Ms. Andrew, and Ms. Hudson over the next few hours.

Appellant's brother, Phillip Bratcher,[1] testified extensively at trial as to what happened that night. Appellant drove his truck to Phillip's trailer in Kokomo, Indiana, arriving at approximately 8:30 p.m. Appellant talked on his cell phone some. The brothers then went to a gas station to get gas for Appellant's truck and then returned to Phillip's trailer. Appellant talked on his cell phone some more. He then asked Phillip to accompany him to Louisville to mediate the conflict between him and Ms. Andrew, and Phillip agreed to go. They left the trailer and took a car that was parked across the street from the trailer. The testimony at trial did not establish who the car belonged to or how Appellant, who normally drove a truck, obtained the car. Phillip's testimony, however, indicated that Appellant wanted to drive the car so that the loose items in the bed of his truck would not get lost during the drive. The drive to Louisville took approximately three hours, during which Appellant talked on his cell phone almost the entire time. When they arrived in Louisville, Appellant parked the car in a lot behind Ms. Andrew's house. When he exited the car, Appellant, who was a physician's assistant in the military, was carrying his medic's bag. He used a key to unlock the back door to Ms. Andrew's house, which he and Phillip then entered.

Appellant went to get Ms. Andrew while Phillip waited in the kitchen. When Appellant returned, Ms. Andrew greeted Phillip, and then she and Appellant began to argue. When Appellant attempted to hug Ms. Andrew, she pushed him away and accused him of lying. The argument, which involved allegations that Appellant was lying about another woman, escalated with Appellant pushing Ms. Andrew. She became extremely agitated and acted as though she were going to hit Appellant, so Phillip intervened and physically restrained her.

When Phillip had calmed Ms. Andrew down, Appellant told him to leave the house and wait outside. Phillip went to the car and waited for his brother. A short time later, Appellant came back to the car. He told Phillip that he and Susan had reconciled, and that he and Phillip could return to Indiana. They drove back to Phillip's trailer, where Appellant then dropped him off and drove away in the car. About thirty minutes later, Phillip heard a noise, looked outside, and saw that Appellant's truck was gone.

At about 9:30 a.m. the next morning, Appellant called Phillip to tell him that he was home. Appellant spent most of the day with Ms. Hudson, but he also placed several calls to Ms. Andrew, leaving messages asking whether she would meet him. He also called Ms. Andrew's daughter and asked her whether she knew where her mother was.

Ms. Andrew was later discovered dead in her house. She had been beaten and strangled. Police estimated that she had died around 2:00 a.m. on Sunday, August 29. The police investigation quickly focused on Appellant and his brother. When the police questioned Phillip, he told them that he and Appellant had stayed in Indiana on August 29. DNA analysis later revealed that a chunk of skin found under Ms. Andrew's fingernail belonged to Phillip, and he was arrested and charged with murder. Phillip entered into an agreement with the Commonwealth's Attorney, where he would testify against his brother in exchange for the Commonwealth's

---

1. In an effort to avoid confusion between Appellant and his brother, hereinafter Phillip Bratcher will be referred to as "Phillip."

promise not to seek an aggravated penalty against him

At trial, Phillip testified that when they returned to the trailer on the night of the murder, Appellant had instructed him to tell anyone who asked that they had been at the trailer in Indiana all night. Phillip also testified that Appellant had shown Phillip a list of times, including when he had arrived at the trailer and when they had fallen asleep, to remember. Phillip further testified that Appellant had told him to stick to their story or risk being blamed for the murder. Finally, he claimed that after his arrest, Appellant had asked him to take the blame for the murder so that Appellant could collect on Ms. Andrew's life insurance policy.

Appellant also testified at trial, but his account of the events of August 28–29, 2000, differs significantly from this brother's. He claimed that he had spent the night at his brother's trailer, and that he fell asleep sometime after 1:00 a.m. on August 29, leaving his brother awake and watching television. He woke around 5:30 a.m. and drove back to Kentucky. He also testified about his brother's interest in magazines about martial arts, soldiers of fortune, and private investigation. He also claimed that Ms. Andrew had made a key to her house available to him, but he had not picked it up before she was killed, and that in the past, he had given his brother directions to Ms. Andrew's house. He claimed that his brother committed the murder.

Appellant was tried jointly with Phillip. The jury convicted Phillip of Intentional Murder, and he was sentenced to twenty-five years under an agreement with the Commonwealth. The jury convicted Appellant of murder and found as an aggravating circumstance that he committed the offense for profit. Appellant was sentenced to life in prison without the possibility of parole. He now appeals his conviction as a matter of right.[2]

## III. ANALYSIS

Appellant raises twelve separate issues. We address each issue in turn.

### A. Separate Trials

■■■ Appellant argues that he should have been tried separately from his brother because their defenses were antagonistic. As a general rule, persons jointly indicted should be tried together.[3] We have expressed a strong preference for such joint trials.[4] The decision as to severance is "matter of judicial discretion."[5] We will not reverse on appeal for failure to sever "unless we are clearly convinced that prejudice occurred and that the likelihood of prejudice was so clearly demonstrated to the trial judge as to make his failure to grant severance an abuse of discretion."[6]

■■ Appellant argues that the trial court abused its discretion in this case because his brother's defense was antagonistic to his own, i.e., they blamed each other for the crime. While we have noted that "[i]n order to justify the granting of a severance, it must appear that the defendants have antagonistic defenses, or that the evidence as to one defendant tends

2. KY. CONST. § 110(2)(b).

3. *United States v. Causey,* 834 F.2d 1277, 1287 (6th Cir.1987) (citing *United States v. Stull,* 743 F.2d 439, 446–47 (6th Cir.1984)).

4. *Wilson v. Commonwealth,* Ky., 836 S.W.2d 872, 886–87 (1992).

5. *Foster v. Commonwealth,* Ky., 827 S.W.2d 670, 679 (1991).

6. *Rachel v. Commonwealth,* Ky., 523 S.W.2d 395, 400 (1975).

directly to incriminate the other," [7] we have also noted that "the allegation that there are antagonistic defenses is only one of the factors for the trial judge to consider." [8] In fact, in a case where one defendant denies any involvement in the crime and places all the blame on the other,[9] that the only claim of prejudice is that the defendants pointed the finger at each other may actually *justify* joinder:

"[N]either antagonistic defenses nor the fact that the evidence for or against one defendant incriminates the other amounts, by itself, to unfair prejudice.... That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place or the extent to which they participated in it, vel non, is a reason for rather than against a joint trial. If one is lying, it is easier for the truth to be determined if all are required to be tried together." [10]

Appellant attempts to show other prejudice by arguing that Phillip's lawyer acted, in effect, as a second prosecutor, out-prosecuting the Commonwealth's attorney and unfairly tainting the entire trial. Appellant specifically points to Phillip's attorney's cross-examination of Appellant. But in reality, this is simply a reiteration of the antagonistic defenses claim in that Phillip's attorney was trying to show Appellant had committed the murder instead of his client.

■ Though "[t]here may be some inherent disadvantage to one defendant if he is required to be tried jointly with a codefendant," [11] the existence of antagonistic defenses alone, absent some other showing of prejudice, is not enough to require reversal. Because Appellant has failed to show any prejudice beyond the mere existence of antagonistic defenses, we find that the trial court did not abuse its discretion in allowing Appellant and his brother to be tried together.

## B. Right to Confrontation

Appellant also claims that the trial court denied his right to confrontation in three separate instances: (1) when the trial court did not allow Appellant to play a videotape of a suppression hearing where Phillip lied regarding police coercion, (2) when the trial court refused to allow introduction into evidence of a letter Phillip wrote to Appellant while incarcerated, and (3) when the trial court did not allow Appellant to cross-examine Phillip regarding post-traumatic stress disorder.

### 1. Videotape of Suppression Hearing

During Phillip's direct testimony at trial, he admitted that he had lied during a suppression hearing in which he claimed that the police misled him in order to get him to provide them with a DNA sample. When he cross-examined Phillip, Appellant wanted to use the videotape as evidence of a prior inconsistent statement, i.e., to show to the jury Phillip's mannerisms when he was lying, specifically how calm he was. The trial court, however, refused to allow Appellant to use the videotape, noting that because Phillip had already admitted that he had lied, the videotape contained no

7. *Tinsley v. Commonwealth*, Ky., 495 S.W.2d 776, 780 (1973).

8. *Foster*, 827 S.W.2d at 679; *see also Gabow v. Commonwealth*, Ky., 34 S.W.3d 63, 71 (2000) ("Even if the defendants attempt to cast blame on each other, severance is not required.").

9. *E.g., Taylor v. Commonwealth*, Ky., 995 S.W.2d 355 (1999).

10. *Id.* at 360 (quoting *Ware v. Commonwealth*, Ky., 537 S.W.2d 174, 177 (1976)) (alteration and omission in original).

11. *Rachel*, 523 S.W.2d at 399.

prior inconsistent statement and would likely confuse the jury.

■ Appellant claimed at trial that this was a prior inconsistent statement and now claims that the trial court interfered with his right to confrontation by not allowing the introduction of Phillip's prior statement. Neither argument is well taken, however. First, Phillip's statements were not prior *inconsistent* statements as contemplated by KRE 613 because he had already admitted that he lied at the prior suppression hearing. Playing the videotape would have had no impeachment value and would simply have been cumulative.

■ As to Appellant's claim that the trial court interfered with his right to confrontation by not allowing him to use the videotape during cross-examination of Phillip, he argues that "it was imperative that the jury observe both the extent to which he concocted a story in the suppression hearing and how calm and collected he was while lying on the stand." Basically, Appellant claims that introduction of the tape would have enabled the jury to compare Philip's demeanor during the suppression hearing, where he gave testimony under oath that he later admitted was a lie, with his demeanor during his testimony at trial. We find no merit in this argument. We fail to see how this was a denial of the right to confrontation. "[T]rial courts retain broad discretion to regulate cross-examination. 'Defendants cannot run rough-shod, doing precisely as they please, simply because cross-examination is underway. So long as a reasonably complete picture of the witness' veracity, bias and motivation is developed, the judge enjoys power and discretion to set appropriate boundaries.'"[12] Appellant was able to cross-examine Phillip extensively, and the jury had already seen Phillip admit he had previously lied under oath in this case. The jury was able to observe Phillip's demeanor during trial, evaluate his credibility, and weigh his testimony accordingly. The trial court did not abuse its discretion in refusing to admit the videotape.

## 2. Phillip's Letter to Appellant

■ Appellant also wanted to introduce part of a letter that his brother had written to him while they were both incarcerated. The relevant portion of the letter reads:

> What I'm going to write has to stay between us regardless of who may ask you anything about anything okay? First Butler [Assistant Commonwealth Attorney] says to my lawyers if I give them a story they can believe he'll give me 25 years. But if I don't get up and testify the same way in court he'll give me life without parole.... He says if I don't give a statement than I'll die and you'll walk.

The trial court refused to allow the admission of this letter on the grounds that it did not represent the deal that was finally reached with the Commonwealth and because this letter constituted negotiations leading up to Phillip's deal with the Commonwealth, which are inadmissible under KRE 410.

■ The trial court's ruling in this regard, i.e., that the letter was a statement made during plea negations, is mistaken. The statement that Appellant sought to introduce was made during communications between Appellant and Phillip, not Phillip and the prosecutor, thus the statement was not covered by KRE 410. Only the statements made during negotiations

---

12. *Commonwealth v. Maddox*, Ky., 955 S.W.2d 718, 721 (1997) (quoting *United States v. Boylan*, 898 F.2d 230, 254 (1st Cir.1990)).

are protected; that Phillip then chose to disclose those negotiations (and statements made during those negotiations) to a third-party does not then bring the exchange with the third-party into the realm contemplated by KRE 410. And, it is apparent that the statements do tend to show that Phillip was under pressure to concoct a story in return for a reduced sentence; thus the letter was evidence of his bias and motive to lie. As the Supreme Court has noted, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." [13]

This does not, however, mean that Appellant's right to confrontation was violated. During cross-examination, Appellant was able to question Phillip extensively about the nature of his deal with the Commonwealth (wherein the Commonwealth agreed not to file aggravated factors, i.e., seek the death penalty, in exchange for Phillip agreeing to be a witness). Appellant even went so far as to have Phillip read the entirety of the deal into evidence. The Commonwealth had already elicited testimony from Phillip that he had previously lied in court, and Appellant questioned Phillip as to his willingness to lie in court again by asking whether Phillip would "do anything" to avoid the death penalty. Appellant's lawyer stated during a bench conference that he intended to introduce the letter at this point in his questioning.

However, once the essential facts constituting bias have been admitted, a trial court "may, of course, impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness, to take account of such factors as 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant. . . .' " [14]

Thus, to paraphrase *Weaver*, the fact that the trial court allowed Appellant to question Phillip about the specifics of his deal with the Commonwealth, together with the fact that testimony concerning his previous lying had already been admitted, "gave the jury enough information to permit a fair appraisal of [Phillip's] possible bias. The trial judge's ruling was a reasonable limitation on this exploration into [Phillip's] motive or bias." [15] The exclusion of the evidence on an incorrect ground, i.e., KRE 410, when it could have excluded the evidence for other reasons, i.e., "broad discretion to regulate cross-examination," [16] does not mean that Appellant's right to confrontation was violated. [17]

### 3. Post–Traumatic Stress Disorder Evidence

■ Appellant also argues that the trial court violated Appellant's right to confrontation when it limited his ability to

---

13. *Davis v. Alaska*, 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

14. *Weaver v. Commonwealth*, Ky., 955 S.W.2d 722, 726 (1997) (quoting *Olden v. Kentucky*, 488 U.S. 227, 232, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986))) (alteration and omission in original).

15. *Id.* (citing *Quinn v. Neal*, 998 F.2d 526, 529 (7th Cir.1993)).

16. *Maddox*, 955 S.W.2d at 721.

17. Cf. *Noel v. Commonwealth*, Ky., 76 S.W.3d 923, 929 (2002) ("We conclude that the trial judge's decision to admit this evidence was correct even though for the wrong reason."); *Tamme v. Commonwealth*, Ky., 973 S.W.2d 13, 31 (1998) ("Nor is it of any consequence that the trial judge reached the correct result for the wrong reason.").

344

cross-examine Phillip as to his alleged post-traumatic stress disorder. The trial court allowed Appellant to question Phillip as to mental lapses, whether he was receiving disability benefits, and whether he was taking medication at the time of the murder. The trial court prohibited Appellant from asking questions specifically about post-traumatic stress disorder, noting the Appellant had failed to establish any foundation, in the form of medical records or medical testimony, for such a line of questioning. This falls squarely within the trial court's "broad discretion to regulate cross-examination"[18] and does not constitute a violation of Appellant's right to confrontation.

## C. Speedy Trial

Appellant argues that his right to a speedy trial under the Sixth Amendment was violated by a lengthy delay between his indictment and trial. In evaluating a claim of a speedy trial violation, we consider four factors: (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant.[19] Appellant filed a motion for a speedy trial on July 7, 2000, thus it is clear that he asserted his right. Also, the length of the delay between indictment and trial—eighteen months—is presumptively prejudicial and weighs against the Commonwealth.[20] We note, however, that this finding that the length of delay was presumptively prejudicial does not preempt application of the fourth factor: " '[P]resumptive prejudice' does not neces-

sarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry."[21]

The trial was originally set for May 7, 2001, and was delayed only because the trial court granted Phillip's January 11, 2001, motion to reassign the trial date, in essence a motion for a continuance. In the motion, Phillip requested the continuance because (1) he claimed he needed more time to have expert testing done on the biological samples that the Commonwealth had taken, (2) he anticipated the necessity for additional hearings in the case given the complex legal issues involved, and (3) his attorney had already scheduled a vacation the week of trial, reservations for which had been made before the trial date had been set. In granting the motion for a continuance, and thus setting the trial on its ultimate date of November 2, 2001, the trial court noted that the Commonwealth *objected* to continuing the trial date. We can only conclude that the Commonwealth did not cause the delay, but then neither did Appellant. Instead, the delay was caused by Appellant's codefendant on whose motion the continuance was granted. As such, this factor weighs against neither the Commonwealth nor Appellant.

Thus we are left to evaluate whether Appellant suffered any prejudice. Under *Barker*, "[p]rejudice ... should be assessed in the light of the interests of defendants which the speedy trial right

---

18. *Maddox,* 955 S.W.2d at 721.

19. *McDonald v. Commonwealth,* Ky., 569 S.W.2d 134, 136 (1978) (citing *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)).

20. *See, e.g., Cain v. Smith,* 686 F.2d 374, 381–82 (6th Cir.1982) (holding an eleven and a half month delay to be presumptively prejudicial).

21. *Doggett v. United States,* 505 U.S. 647, 652, 112 S.Ct. 2686, 2691, 120 L.Ed.2d 520 n. 1 (1992).

was designed to protect."[22] Those interests include the following: preventing oppressive pretrial incarceration, minimizing anxiety and concern of the accused, and limiting the possibility that the defense will be impaired. Though Appellant's reply brief claims that he was prejudiced by "the trauma cause[d by lengthy incarceration], and the possibility that his defense was impaired," he fails to show such prejudice. Conclusory claims about the trauma of incarceration, without proof of such trauma, and the *possibility* of an impaired defense are not sufficient to show prejudice. As we noted above, a long delay, while creating "presumptive prejudice" sufficient to continue the *Barker* analysis, does not necessarily create real prejudice to a defendant. Given the complexity of the case, wherein Appellant was accused of committing murder for profit and was possibly facing the death penalty, eighteen months was not so oppressive an incarceration to automatically weigh this factor against the Commonwealth. Because Appellant has failed to show that the delay caused him anxiety and concern or that it impaired his defense, we cannot weigh this factor in his favor. Thus, we conclude that Appellant's right to a speedy trial was not violated.

### D. Inconsistent Removal of Prospective Jurors for Hardship

During voir dire, the trial court removed eight jurors because their employers did not pay them for the missed days, three jurors who were "stay-at-home" mothers and the sole care providers for their children, and one juror who worked for his brother and brought a letter from the brother stating that his small family-owned business would suffer from the ju-

ror's absence. The trial court denied Appellant's motions to remove four jurors, three of whom were white-collar workers with busy jobs but whom the trial court found would not be overly burdened by jury service, and one whose mother was in poor health.

Appellant argues that this is evidence of the trial court's violation of KRS 29A.100, which states that a "trial judge may excuse [a] juror upon a showing of undue hardship, extreme inconvenience, or public necessity." Specifically, Appellant claims that because the trial court did not excuse the four jurors who he challenged for cause, the trial court did not consistently apply KRS 29A.100. But Appellant has failed to show the trial court was incorrect or that it abused its discretion in finding that those four jurors would not suffer a hardship. In fact, it is apparent that the trial court was applying KRS 29A.100 quite consistently because he removed those jurors who showed that they would suffer a hardship, either with regard to their finances or their children, but refused to remove those jurors who did not show a hardship. This is exactly the determination required by KRS 29A.100.

Appellant also makes the curious argument that the trial court systemically excluded mothers and persons from lower economic brackets, and thus the trial court engaged in a de facto automatic exemption for those people. While it is unquestioned that "[t]here shall be no automatic exemptions from jury service,"[23] we find that the trial court granted no such automatic or per se exemptions. Instead, the trial court applied the hardship provision of KRS 29A.100, and did so correctly. That such application tends to allow the trial court to excuse mothers who have no alternative

---

**22.** *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193.

**23.** KRS 29A.090.

methods of childcare or people with lower-paying jobs is perhaps an inevitable result of a hardship exemption. This, however, does not constitute the sort of "systematic exclusion of a distinctive group" [24] that is prohibited in jury selection.

### E. Prospective Jurors Not Struck For Cause

■■■■■ Appellant also claims that his constitutional right to a fair trial was violated by the trial court's failure during individual voir dire to remove for cause two prospective jurors, Juror 7115 and Juror 6851. Appellant argues that these jurors were not qualified and could not be fair and impartial. While we recognize that it is reversible error if a juror should have been excused and was not,[25] we also note that the trial court has broad discretion in determining whether a prospective juror should be excused for cause.[26]

■■■ Appellant challenged Juror 7115 because one of her neighbors, who she had employed as a babysitter, had been murdered when the juror lived in New York. She said that the incident was upsetting and that it had made her more cautious in general, but that she would consider all the facts and that she felt she could be fair. Appellant claims that her "demeanor, not necessarily her words," showed that she could not be impartial or fair, and that under the totality of the circumstances, specifically the nature of the crime against her neighbor and her relationship with that neighbor, it was impos-

sible for the juror to be fair and impartial. Appellant draws our attention to *Montgomery v. Commonwealth* [27] for support. In *Montgomery*, we noted that it makes no difference that a juror claims he or she could be fair, and that the trial court should be guided by the probability of prejudice.[28] But in that case, the bias attributed to the juror stemmed from exposure to pretrial publicity, which is not the case here. And we have noted that the fact a juror was the victim of a crime similar to what the defendant is charged with is not grounds for an automatic removal if the trial court is satisfied that the juror could "objectively evaluate the evidence relating to all counts of the indictment and render a fair verdict." [29] Appellant's attorneys questioned the juror extensively and failed to elicit any evidence of potential bias stemming from her experience. The trial court was satisfied that the juror would be fair and impartial, and so are we. The trial court did not abuse its discretion in not removing this juror for cause.

■■■ Juror 6851 was a corporate attorney who had worked in a prosecutor's office while in law school in 1986. Appellant challenged him because his knowledge of the law, specifically of parole eligibility, might taint the jury. Appellant now points to the fact that the trial court had previously excused another juror, Juror 9699, who had been exposed to the parole system through his experience as a volunteer chaplain at a state prison, because of

24. *Commonwealth v. McFerron,* Ky., 680 S.W.2d 924, 927 (1984).

25. *Thomas v. Commonwealth,* Ky., 864 S.W.2d 252, 259 (1993).

26. *Mabe v. Commonwealth,* 884 S.W.2d 668, 670 (1994).

27. Ky., 819 S.W.2d 713 (1991).

28. *Id.* at 718.

29. *Whalen v. Commonwealth,* Ky., 891 S.W.2d 86, 88 (1995), *overruled in part on other grounds by Moore v. Commonwealth,* 990 S.W.2d 618 (1999); *see also Woodall v. Commonwealth,* Ky., 63 S.W.3d 104, 118 (2001) (holding that failure to excuse juror whose sister had been raped was not error).

his knowledge of parole eligibility. Though no error has been asserted in the removal of Juror 9699, Appellant does claim that if this juror was properly excused, then Juror 6851 should have also been excused. As we have noted before, "there is no authority for the proposition that mere knowledge about parole eligibility is a basis for a challenge for cause." [30] The trial court did not abuse its discretion in refusing to excuse Juror 6851 for cause.

## F. Sufficiency of the Evidence

■ Appellant claims that the Commonwealth failed to prove beyond a reasonable doubt that he committed the murder or that the aggravator, murder for profit, was present. Specifically he claims that the only physical evidence in the case, the DNA found under Ms. Andrew's fingernails, connected Phillip to the murder, and that he was implicated only by Phillip's testimony. As to the aggravator, he argues that he had no knowledge before the murder that he was a beneficiary of Ms. Andrew's life insurance. Thus, he claims he was entitled to a directed verdict of acquittal.

■ "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." [31] The jury heard testimony that Appellant and his brother visited Ms. Andrew and that Appellant and Ms. Andrew fought on the night that she was murdered, that Appellant then asked his brother to lie about their whereabouts on that night, that Appellant knew about the insurance policies, and that Appellant even admitted to his brother that the insurance

money had been his motive. If true, this evidence is sufficient to sustain the jury's verdict. And whether the testimony was true, i.e., whether the witnesses presenting this testimony were credible, is the province of the jury.[32] The Commonwealth sufficiently proved its case to get to the jury, and the trial court's refusal to grant a directed verdict was not error.

## G. Hearsay

Appellant also raises issues with a number of hearsay statements that the trial court admitted into evidence. The statements involved, mostly in paraphrased form, are as follows:

1. Testimony by Linda Kraus ("Kraus"), a friend of Ms. Andrew, that Ms. Andrew had told her she was going to put money in a bank account for Appellant because he had depleted all his funds.

2. Testimony by Kraus that Ms. Andrew repeatedly told her that she was going to give Appellant money because she felt that he needed financial assistance.

3. Testimony by Kraus that Ms. Andrew told her that she intended to make Appellant a beneficiary of her life insurance.

4. Testimony by Fred Bear ("Bear"), a co-worker of Ms. Andrew, that Ms. Andrew told him the day before her murder that she was upset at Appellant because he had not shown up at her home for a special dinner the night before.

5. Testimony by Bear that Ms. Andrew told him that she unsuccessfully tried to call Appellant repeatedly af-

30. *Woodall,* 63 S.W.3d at 118.

31. *Commonwealth v. Benham,* Ky., 816 S.W.2d 186, 187 (1991).

32. *Matherly v. Commonwealth,* Ky., 436 S.W.2d 793 (1968).

ter he failed to show for the special dinner.

6. Testimony by Charlotte Dye, a co-worker of Ms. Andrew, about a lengthy and complex statement made by Ms. Andrew on August 27. The challenged testimony is as follows:

She said that he had not shown up for dinner the previous night as they had planned and that she was very upset and that he had not called her and she had tried to reach him to get an explanation as to why he hadn't followed through on their plans. And by the time she actually left the message and decided to leave one, she was very even more distraught and she told him she wasn't going to see him anymore and that she was going to break off the relationship.... She said she was really angry with him. Then she said that she had been very supportive of him in his separation from his wife and had done things for him that she thought was beyond what really she should have done. He had broken her spirit and that if he was going to be so unkind when she had been so supportive that he needed some kind of psychological type of help. Also she told me that she said that she told him that the two younger of the children didn't belong with him if he was that kind of unkind of a person and she had always said that she thought he was a better parent and that they should be with him before that.

7. Testimony by Kelly Pope ("Pope"), a co-worker of Ms. Andrew, that Ms. Andrew once told her that she gave Appellant her Army Reserve check because she did not need it.

8. Testimony by Pope that Ms. Andrew was upset and was having trouble focusing, and that Ms. Andrew said that she was angry with Appellant.

9. Testimony by Kate Smothers ("Smothers"), Ms. Andrew's daughter, that Ms. Andrew told her that Appellant was not doing well and that she was going to keep giving him her Army Reserve checks because he needed some help.

10. Testimony by Smothers that Ms. Andrew had called her on August 28 and left a message on her cell phone telling her that she was on her way home and that Appellant had "gotten himself into some kind of trouble."

11. Testimony by Kraus that Ms. Andrew

would call [her] and say, "You know, he's supposed to come, he's supposed to be here tonight and I've not heard from him." Once he'd told her that he had just fell asleep in the RV, and ... once he told her that he had a migraine. And then another time he was supposed to be there and he told her that he headed back to Kokomo instead of coming straight to her when he called her and said, "I'm just right close to you."

12. Testimony by Kraus that when she asked Ms. Andrew if Appellant might be seeing another woman, Ms. Andrew replied, "I'd find it hard to believe there would be another woman because he has trouble getting his pecker up."

Statements 1, 2, 3, and 9 were properly admitted under KRE 803(3) as evidence of Ms. Andrew's then existing mental state, specifically her intent to give Appellant money.[33] Statements 4, 5, and 8

33. KRE 803(3) ("The following are not ex- cluded by the hearsay rules, even though the

were also properly admitted under KRE 803(3) as evidence of Ms. Andrew's mental state, specifically her mental feelings, pain, and intent to break off her relationship with Appellant. The majority of Statement 6 was properly admissible under the same analysis, especially since Ms. Andrew specifically articulated her desire to end her relationship with Appellant. And while Statement 6 contains some elements that, considered alone, would not be admissible (e.g., "[s]he said that he had not shown up for dinner the previous night" and "she said that she had been very supportive of him in his separation from his wife and had done things for him that she thought was beyond what really she should have done"), when considered in the context of the clearly admissible portions of the statement, they simply go to show her then existing mental state, specifically her intent to end the relationship, and were thus properly admitted under KRE 803(3).[34] But even if those questionable portions of Statement 6 were inadmissible, they were not sufficient to change the outcome of the trial, and we find that their admission was at most harmless error.[35]

▮▮▮▮ Statement 11 is evidence of Ms. Andrew's then existing mental state, namely, that she was upset with Appellant,

and, therefore, the statement is admissible for that purpose. What Appellant purportedly told Ms. Andrew was not admitted to prove the truth of the matter asserted, i.e., the truth of the reasons that Appellant gave for standing her up, but merely to explain further the reason that Ms. Andrew was upset. Accordingly Appellant's purported statements were not hearsay.[36] Regardless, because there is no substantial possibility that the result would have been different if those statements had been excluded, we find that their admission, if error, was harmless.[37]

▮▮▮▮ Statement 7 constituted a "statement of memory . . . to prove [the] fact remembered,"[38] and thus was not properly admissible. But because the Statement is almost identical to several other statements of future intent, i.e., Statements 1, 2, 3, and 9, except that it showed such action in the past, we find that its admission was harmless error.[39] Statements 10 and 12 also do not appear to fall under any of the exceptions to the hearsay rule. But again, because there is no substantial possibility that the result would have been different if those statements had been excluded, we find that their admission was harmless error.[40]

declarant is available as a witness: . . . (3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) . . . .").

**34.** *See Crowe v. Commonwealth*, Ky., 38 S.W.3d 379, 383 (2001) (holding that testimony from the victim's co-workers about conversations in which the victim had stated her intention to tell the defendant that she wanted a divorce on the night of the murder was allowed because it tended, at least inferentially, to prove the victim's intent to inform appellant on the evening of her death that she wanted a divorce).

**35.** RCr 9.24.

**36.** KRE 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

**37.** RCr 9.24.

**38.** KRE 803(3).

**39.** RCr 9.24.

**40.** *Id.*

## H. Evidence of Extramarital Affairs and Other Bad Acts

■ Appellant claims that the trial court erred in allowing evidence of Appellant's extra-marital affairs and other bad acts because this evidence was irrelevant and inflammatory. Appellant admits that for the majority of these claims, nine of thirteen, there was no contemporaneous objection at trial. Appellant argues that several of these claims were preserved in part by a motion *in limine* to prohibit the introduction of evidence of Appellant's extra-marital dalliances. Appellant, however, has only cited to the oral argument on the motion, after which the trial court indicated a ruling would be forthcoming, and not to any portion of the record where the trial court made a ruling on this particular motion *in limine*. And our own review of the record, specifically the final pretrial motions, has failed to reveal such a ruling. As such, it is apparent that the trial court failed to address this motion *in limine*, and Appellant did not ask for a ruling after initially arguing the motion. As such, these claims were not preserved for our review.[41] Four of Appellant's claims, however, were preserved by objections during trial, and we address each of those in turn.

### 1. Melissa Hudson's Infidelity Testimony

■ During her direct testimony, Melissa Hudson ("Hudson") began by describing her relationship with Appellant. She testified that she knew Appellant when she was a little girl, that she met him again in 1992, and that they began having an affair in 1993 that resulted in a child. She also mentioned that both she and Appellant were married to other people at the time of the affair. Appellant did not object to this testimony. The Commonwealth then began questioning her about Appellant's financial activity in 1998 and 1999. The Commonwealth then asked Hudson when in 1999 that she began to suspect that Appellant was being unfaithful to her. At this point the Appellant objected, arguing that testimony about infidelity had no probative value and was prejudicial. The Commonwealth replied that the testimony would explain why Hudson was going through Appellant's trash on August 28, 1999, that it would explain his reaction when Ms. Andrew questioned him that night, and that the next question was moving on to the time surrounding the murder. At this explanation, Appellant's lawyer said, "that's fine," and the trial court overruled the objection.

■ Appellant now relies on this objection in urging us to find that introduction of evidence of his marital infidelity was improper and prejudicial. As a contemporaneous objection, however, this covers, at most, the specific questioning about Appellant's infidelity to Hudson in 1999. And while "evidence of marital infidelity that lacks legitimate connection to the crime charged amounts to an attack on the defendant's character and results in prejudicial error,"[42] that is not the case here because, this testimony was elicited to create a context for the events in the days leading up to Ms. Andrew's death. The testimony also points to a possible motive for Appellant, namely the fact that the two women he was seeing were about to discover each other. As such, it was not error to admit this testimony. Furthermore, Appellant waived this issue when his attorney said "that's fine" once the Commonwealth explained the purpose of the questioning.

41. *Turner v. Commonwealth*, Ky., 460 S.W.2d 345, 346 (1970).

42. *Smith v. Commonwealth*, 904 S.W.2d 220, 222 (1995).

## 2. Tiffany Ratliff's Bankruptcy Testimony

 Appellant also takes issue with part of the testimony of Tiffany Ratliff ("Ratliff"), a paralegal, about his bankruptcy petition, which was offered to establish the financial motive for the crime. Specifically, Appellant claims that Ratliff was allowed to testify, over his objection, that the bankruptcy documents indicate that Appellant forged his ex-wife's signature on some loan documents, and that such testimony was inappropriate because it did nothing to prove that Appellant committed the murder. First we would note that a review of the records reveals that Appellant did not make the objection during trial; rather, the trial court raised the issue by stopping Ratliff's testimony preemptively and calling the lawyers to the bench. Because Appellant's attorney participated in the discussion of this issue during the bench conference, we will address the merits of Appellant's argument.

We would simply note that Appellant mischaracterizes the testimony given by Ratliff on this issue. The Commonwealth asked her whether there was a letter included with the loan documents from Appellant to the bank making the loan wherein Appellant claims he was empowered to sign his ex-wife's name to the loan documents. Ratliff did not testify as to whether Appellant had forged the signature (though, based on comments made at the bench-conference, the possibility that Ratliff might make that inference is what the trial court was concerned about). Appellant's ex-wife, however, had already testified that Appellant had forged her signature.

 As to Appellant's contention that the testimony did nothing to prove that he murdered Ms. Andrew, we would note that Ratliff's testimony simply shored up the testimony of Appellant's ex-wife. And testimony about whether Appellant forged the signature on the loan documents goes to proving the condition of Appellant's finances at the time of the murder, which in turn helps prove the financial motive claimed by the Commonwealth. As such, Ratliff's testimony on this issue was proper.

## 3. Cross–Examination of Appellant Regarding Bankruptcy and Life Insurance

 Appellant also claims error in a line of cross-examination by Phillip's lawyer when Appellant was on the stand. Phillip's lawyer asked Appellant why he failed to disclose on his bankruptcy petition that he had an interest in any life insurance benefits. Phillip's lawyer asked several questions in this vein, finally asking whether Appellant had intentionally attempted to defraud his creditors. When Appellant replied that he had not been thinking of that, Phillip's lawyer made the sarcastic remark, "I'm sure you didn't." Appellant's lawyer objected. The trial judge sustained the objection. Phillip's lawyer agreed not to make further inappropriate comments, but Appellant did not ask for the jury to be admonished, evidencing that he was satisfied with the result. While we certainly agree that the sarcastic remark was inappropriate, it did not rise to the level of a harmful error. As to Appellant's general relevance and prejudice concerns regarding this line of testimony, we note simply that the questioning was aimed at eliciting Appellant's financial motive for committing the crime and thus was appropriate.

 In his brief, Appellant also makes a vague allegation that this line of questioning and testimony contained improper character evidence because the defense received no notice pursuant to KRE 404(c). KRE 404(c) would be inapplicable

here because it applies only to the prosecution, whereas the cross-examination in question here was by the lawyer for a codefendant. Also, the questioning was actually proper under KRE 404(b) as it was designed to elicit evidence of Appellant's motive. But most importantly, this aspect of the testimony, i.e., its "character evidence" nature, was not the subject of an objection at trial, and thus was not preserved.

### 4. Inappropriate Comment by Phillip's Lawyer

As Phillip's lawyer was sitting down after finishing his cross-examination of Appellant, he turned from the jury and muttered under his breath, "He's a piece of scum." The trial court then took a short recess, during which Appellant's sister, who had been sitting in the galley and had overheard the comment, approached Appellant's lawyer to ask why the comment had been made. Upon the jury's return to the courtroom, Appellant's lawyer informed the court of this potentially prejudicial comment. The trial court questioned the two jurors closest to the defense table where Phillip's lawyers were seated. None of these jurors heard the lawyer's comment. The judge refused to question the other jurors—a decision that Appellant now claims was error. Again, though the comment was inappropriate, we do not think it merits reversal. The trial judge was satisfied that the jurors did not hear the comment, and Appellant's own attorney had not heard the comment. The trial court resolved the situation effectively and the improper comment was harmless.

### I. Ligature Expert Testimony

Appellant claims that the trial court erred in allowing the Commonwealth to present the testimony of Bill Grimes ("Grimes") as an expert on ligatures used for strangulation. Specifically, Appellant argues that Grimes was not qualified to give expert testimony on the use of ligatures, i.e., his testimony would not be "reliable," that his testimony would not assist the trier of fact because there was no question that Ms. Andrew was strangled and that the testimony as to the type and purpose of ligature used did nothing to establish who committed the murder.

When the Commonwealth called Grimes as a witness, Appellant challenged his qualifications as an expert. The trial court allowed the Commonwealth to lay a foundation for Grimes's qualification as an expert by letting him be questioned as to his qualifications in front of the jury. Appellant's attorney was then allowed to voir dire Grimes outside the presence of the jury. His testimony revealed that he had enlisted in the Army in 1964 and went through Officer Candidate School. He received significant combat and Special Forces training, which included the use of rope as a strangling weapon, which he referred to as a "garrote." He then served in Southeast Asia from 1966 to 1970, during which he engaged in special operations and assisted in training Navy SEALs and a large detachment of native soldiers in Thailand for special operations skills, which included the use of knives and garrotes. At one point, Appellant's lawyer asked, "You're testifying under oath that back in the 70s and even before that, you used these tactics yourself defending our country?" Grimes replied, "Yes sir," with the clear implication being that during his non-training assignments in Southeast Asia, i.e., during combat, he personally used garrotes in the field. Upon his return to the United States in 1970, he was a Special Forces instructor for about one year, during which he taught about special and covert operations, which included training in the use of a garrote. Since

then, he has also served in the Army Reserves, where he has specifically trained soldiers in the use of garrotes.

After hearing this testimony, the trial court ruled under KRE 702 that "Mr. Grimes is qualified to testify concerning the design and use of ligatures" and that his "specialized knowledge will be helpful to the jury in deciding an issue of fact in this case." Basically, the trial court made a finding that the proffered expert testimony was both reliable and relevant.[43] Grimes went on to testify that a garrote and a "ligature" were the same thing in this context, with the latter term deriving from the jargon of medical examiners. He also testified that the particular type of ligature used in this case—a rope with several knots along its length and with a slipknot and loop on each end—was designed more as a means of controlling the victim, possibly with one hand, and that, as a result, it would kill slowly.

We review the overall decision as to whether to admit expert testimony for abuse of discretion.[44] Because the finding of reliability, i.e., whether the witness is qualified as an expert, is "a factual determination," [45] we review that specific finding for clear error. The trial court's finding that Grimes was qualified as an expert was supported by substantial evidence. We have noted that a witness can be qualified as an expert without possessing a particular academic degree.[46] And in this case, Grimes demonstrated that he had received extensive training, and had practical experience, in the use of garrotes, and was learned enough on the topic to teach other soldiers. The trial court's finding

that Grimes was qualified as an expert was not clearly erroneous. Because the murder weapon in this case was a type of garrote, Grimes's testimony was relevant to show the jury how the murder was committed and why the particular type of ligature was used. As such, the trial court's decision to allow Grimes to testify as an expert was not an abuse of discretion.

■ Appellant also claims that because Grimes received his training in the use of ligatures in the military, that allowing him to testify created the inference that Appellant would also have received such training, even though he was not in the Special Forces. He claims that he should have been able to refute this inference by introducing evidence from his military record, specifically "what he, as a physician's assistant in the military, did during his time of service, including the receipt of awards for saving people's lives, not killing them." Such evidence, however, would have served only to bolster Appellant's character and it would not have refuted any implication that he received combat training in the use of ligatures. Instead, the appropriate means to counter the inference would have been to have Appellant himself testify, seek admission of specific portions of Appellant's record related to what type of training he received, and/or to ask Grimes if a physician's assistant would have received ligature training. The trial court did not commit error in refusing to allow Appellant to admit evidence of awards for saving lives.

**43.** *See Goodyear Tire and Rubber Co. v. Thompson*, Ky., 11 S.W.3d 575, 578 ("[P]roffered expert testimony ... must be both relevant and reliable.").

**44.** *Fugate v. Commonwealth*, Ky., 993 S.W.2d 931, 935 (1999).

**45.** ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 6.20[6], at 456 (4th ed.2003).

**46.** *Fugate*, 993 S.W.2d at 935.

## J. Ability to Present a Defense

Appellant claims that the trial court prevented him from presenting his defense when it refused to allow him to introduce the following evidence: (1) the location of the cell phone tower that logged a call he made on Sunday, August 29, 2000; (2) cross-examination of the lead investigative detective about the former lead detective; and (3) testimony about Phillip's unusual behavior in Los Angeles, California in the 1970s.

### 1. Cell Phone Tower

■ When the Commonwealth subpoenaed the cell phone records for Appellant, Ms. Andrew, and others, the telephone companies in charge of the records indicated that they no longer had information regarding which cell phone towers had been used when the calls were made. The Commonwealth inquired as to this because this information would give the approximate location, within a few miles, of the cell phone when the call was made. Appellant claims he should have been allowed to introduce one of the cell phone records that seems to indicate that one of the calls was made from Jeffersonville, Indiana because it corroborates his testimony that he made the call while traveling from Indiana to Kentucky. The notation that indicates the location of this call, however, is handwritten. The Commonwealth did not know who wrote this notation, and Appellant offered no explanation, much less evidence, of its source. The record contains no evidence that would provide a means for the trial court to even begin verifying the validity or source of the handwritten notation. Appellant's claim that because the notation was present in the discovery when it was provided by the Commonwealth, the

notation should be admissible. We disagree. The mere fact that the notation was present in the discovery is not a sufficient authentication or identification so as to make the evidence admissible.[47] Given the dearth of proof as to the source of the note, we conclude that the trial court did not abuse its discretion in refusing to allow Appellant to admit this notation.

### 2. Former Lead Investigator

■ Detective Steven Hall was the original lead investigator into the murder of Ms. Andrew. He interviewed many of the witnesses in the case and was the only witness to appear before the Grand Jury in this case. During the investigation, however, he was charged with illegally obtaining prescription drugs and he resigned from the police on July 6, 2000. Detective Hall did not testify at trial. When Detective Hickerson, the investigator who replaced Detective Hall, testified, Appellant wanted to cross-examine him about Detective Hall's criminal charge, but the trial court refused to allow the line of questioning on the grounds that it was an attempt to cross-examine and impeach on a collateral matter.

■ It is a long-standing rule of Kentucky law that "a witness cannot be cross-examined and then contradicted as to a collateral matter." [48] Had the Commonwealth offered Detective Hall as a witness, for example, because he was the only person with knowledge as to certain aspects of the investigation, this line of questioning might have been appropriate. But because Detective Hall was not called as a witness and Appellant has failed to show that proposed line of questioning would have yielded probative testimony, we agree with the trial court that this was a

---

47. *See* KRE 901.

48. *Baker Pool Co. v. Bennett*, Ky., 411 S.W.2d 335, 338 (1967).

collateral issue.[49] As such, the trial court did not abuse its discretion in refusing to allow Appellant to cross-examine Detective Hickerson as to Detective Hall's criminal charges.

### 3. Phillip's Unusual Behavior

During his direct testimony, Appellant testified about how he had Phillip move in with him when he was living in Los Angeles, California during the 1970s. He then helped Phillip get a job, a car, and an apartment, but that Phillip then abruptly left and went to Indiana. At this point, Phillip's lawyer objected on the grounds of relevance and asked that the jury be admonished to ignore the testimony regarding Phillip's activities in California. The trial court sustained the objection, but did not give the requested admonishment. Appellant now claims that the trial court prevented him from offering testimony as to Phillip's prior erratic behavior, specifically his behavior in California, which went to Appellant's theory that Phillip committed the murder.

First, we note Appellant offers no proof that the trial court abused its discretion in limiting the testimony on this issue. But more importantly, Appellant actually did get to testify as to Phillip's erratic behavior in California. Phillip's objection came after the testimony was given, and the trial court did not admonish the jury to ignore the testimony. The testimony that Appellant claims he should have been allowed to give was actually admitted at trial and the jury was allowed to consider it. There was no error. We also would note that any objection to excluding additional evidence of Phillip's behavior in California is not preserved for our review.[50]

### K. Testimony Regarding " *67"

 The Commonwealth presented a significant amount of evidence regarding telephone calls made by Appellant and others. This evidence was presented through the testimony of Melissa Reynolds ("Reynolds"), a paralegal in the Commonwealth's Attorney's office. Near the end of her testimony, she described a call from Appellant's phone as having been prefaced by "star 67" (or, as it is commonly written, " *67"). When she began to testify as what *67 meant, Appellant objected, arguing that she was not qualified to give expert testimony, specifically that she was not qualified to determine if a given call listed on a telephone record was a *67 call. The trial court overruled the objection and allowed Reynolds to "testify as to what her knowledge and experience is as a consumer of telephone services." She went on to testify that the *67 feature allows a caller to make a phone call without his telephone number showing up on the caller-ID of the person being called. Appellant now raises the same argument, claiming that "her testimony as to the presence of a *67 phone call and its meaning was not legitimate lay witness testimony" and that the Commonwealth should have called an expert witness.

 Though knowledge of modern telephone features is by no means universal, it is common enough that non-expert testimony about local telephone features such as *67, much like the more well-known "star 69" (which, depending on the particular service offered, either gives the

**49.** *See Shirley v. Commonwealth,* Ky., 378 S.W.2d 816, 818 (1964) (holding that cross-examination of witness about his public drunkenness convictions that were unrelated to the case at hand was a collateral issue).

**50.** KRE 103(a)(2); *Hart v. Commonwealth,* 116 S.W.3d 481, 484 (Ky.2003).

time and number of the last incoming call or dials the number of the last incoming call), is allowed so long as the witness has personal knowledge of the feature and how it works. Such testimony, if limited to whether a number listed on a bill is prefaced by the code that designates a given feature and/or a basic explanation of how the feature works, as in this case, does not even have to fall under lay testimony restrictions because such testimony is not "opinion or inference[ ]." [51] Reynolds did not testify as to what the use of this feature meant in terms of the intent of the caller to deceive or anything else. She simply testified that the call was a *67 call and that *67 prevented the caller's phone number from showing up on caller-ID. The trial court did not abuse its discretion in allowing this limited testimony.

### L. Aggravator in Indictment

Appellant argues that because the aggravator was not included in the indictment, he did not receive adequate notice, and the notice of aggravated circumstances finally propounded by the Commonwealth failed to meet the requirements of KRS 532.025(1)(a). The indictment, returned on April 13, 2001, reads as follows:

> That on or between the 28th day of August 1999, and the 30th day of August 1999, in Jefferson County, Kentucky, the above named defendants, Phillip B. Bratcher and Mark A. Bratcher, acting alone or in complicity with each other, committed the offense of Murder by intentionally or under circumstances manifesting extreme indifference to human life wantonly caused the murder of Susan Andrew.

The specific charge in the indictment, as listed beside the style of the case, i.e.,

"The Commonwealth of Kentucky Against Phillip B. Bratcher [and] Mark A. Bratcher," is:

> MURDER
>
> KRS 507.020 Capital Offense
>
> 20 years to 50 years; or Life; or Life Without
>
> Parole; or Life Without Parole for 25 Years;
>
> or Death

The Commonwealth also filed a "Notice of Aggravating Circumstances" on September 17, 2001, which reads: "The Commonwealth's proof will demonstrate that the defendant committed the offense of murder in this case for the purpose of receiving money as the beneficiary of some of the victim's life insurance policies. The proof is outlined in the discovery documents the Commonwealth has previously provided for defense counsel." Appellant did not challenge the sufficiency of the indictment or the notice of aggravating circumstances prior to trial.

■■■ The issue of whether specific aggravating factors must be listed in the indictment has already been decided in Kentucky. As we noted previously in *Furnish v. Commonwealth*, "Appellant ... contends that because the Grand Jury failed to include aggravating circumstances in the murder indictment the prosecution was precluded from seeking the death penalty. We disagree." [52] The circumstances in *Furnish* were strikingly similar to those now before us:

> The indictment, which was returned on August 14, 1998, clearly charged Appellant with "Murder, a capital offense, when he caused the death of Jean Williamson, by strangling her to death, in violation of KRS 507.020

---

**51.** KRE 701.

**52.** Ky., 95 S.W.3d 34, 41 (2002).

....'" Moreover, on the same date that the indictment was returned, the Commonwealth filed a formal "Notice of Aggravating Circumstances," which stated that the case would be prosecuted as a capital case based on the aggravating circumstances of the murder being committed while Appellant was engaged in the commission of first-degree robbery and first-degree burglary. At no time prior to this appeal did defense counsel complain of insufficient notice and Appellant may not claim such at this time.[53]

The indictment in this case, which lists "Murder" as the offense charged, describes the charge as a "Capital Offense," and lists "Death" as a possible penalty, was more than sufficient to give Appellant notice of the charge he faced. Likewise, the notice of aggravating circumstances was sufficient. It described the specific aggravator (murder for profit) and the proof that the Commonwealth intended to rely upon (that Appellant was the beneficiary of the victim's life insurance).

On a final note, Appellant's reliance on *Jones v. United States*[54] and *Apprendi v. New Jersey*[55] in this matter is misplaced. The thrust of both cases is that the jury, not the judge, must determine facts that increase penalties. In this case, the jury determined that an aggravating factor was present. The cases Appellant cites do not stand for the proposition that a specific aggravating factor must be listed in the indictment. As the Supreme Court noted in *Apprendi*, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be sub-

mitted to a jury, and proved beyond a reasonable doubt."[56] But the "statutory maximum," as described in the indictment, was *death*—a harsher penalty than that received by Appellant. As such, the trial court committed no error in this regard.

## IV. CONCLUSION

For the foregoing reasons, Appellant's conviction is affirmed.

All concur.

---

**53.** *Id.* (omission in original).

**54.** 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).

**55.** 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

**56.** *Id.* at 489, 2362–63, 120 S.Ct. 2348 (emphasis added).