# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: FEBRUARY 19, 2009
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2007-SC-000289-MR

JAMES ROBERT GIRTON APPELLANT

V.

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE F. KENNETH CONLIFFE, JUDGE
NO. 06-CR-000778

COMMONWEALTH OF KENTUCKY APPELLEE

AND 2007-SC-000293-MR

DRASHAWN BARTLETT APPELLANT

V.

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE F. KENNETH CONLIFFE, JUDGE
NO. 06-CR-000054

COMMONWEALTH OF KENTUCKY APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

At approximately 7:00 pm on November 9, 2005, Adolfo Jimenez was shot and killed at his home in the Arcadia Apartments in the 1500 block of Oleanda Avenue in Louisville. The Commonwealth accused Drashawn Bartlett and James Girton of Jimenez's murder and sought the death penalty against Bartlett. Girton, a minor at the time of the offense, was ineligible for capital

punishment. Following a two week trial in January and February 2007, a Jefferson County jury convicted both defendants of first-degree robbery and second-degree manslaughter. By judgments entered March 26, 2007, the Jefferson Circuit Court sentenced Bartlett to consecutive terms of imprisonment totaling twenty-eight years and Girton, who was also convicted of possession of a handgun by a minor and of tampering with physical evidence, to a total sentence of twenty-five years. Bartlett and Girton appeal from those judgments as a matter of right.

Given the common underlying facts and overlapping legal issues, we shall address the two appeals in this single opinion. Each appellant contends that the jury should have been given the option of finding him guilty of merely facilitating the other's crimes. Each also contends that statements he gave to investigating officers should have been suppressed as fruits of an invalid search warrant. In addition, Bartlett challenges the admission of numerous items of evidence, claims that his robbery conviction was based on insufficient evidence, and maintains that the second of his custodial statements to the investigators was improperly induced. Girton contends that he was denied his right to participate in the individual voir dire. Finding no reversible error, we affirm both judgments.

## **RELEVANT FACTS**

At trial, all four of the defendants' taped custodial statements, two by Bartlett and two by Girton, were played for the jury. Bartlett and Girton each testified, moreover, with the result that the jury was presented with six

2

versions of the shooting most of them differing in significant respects. Additionally, two witnesses who had been outside Jimenez's apartment at the time of the shooting described what they saw just before and after the shooting, and two of the appellants' friends and Bartlett's grandmother testified to events before and/or after the crime. Although these accounts differed in many particulars, the following general outline of events emerged.

The day of the shooting, November 9, 2005, was a Wednesday. The previous weekend, or perhaps a few days before, Harrison Morgan, a mutual friend of both twenty-three year old Bartlett and seventeen year old Girton, had moved into an apartment in the Iroquois Housing Project in Louisville, had introduced Bartlett and Girton to each other, and had invited them to move in with him, at least temporarily. The following Wednesday, Bartlett and Girton wanted to move stereo equipment and Bartlett's television to the new apartment and so enlisted the help of Girton's girlfriend, Tanise Harris, whose 1990 Lexus provided them with transportation. They finished moving those items by mid-afternoon and then spent the rest of the afternoon listening to music; playing video games; and, according to Girton, smoking marijuana.

Bartlett had been living with his grandmother, and at approximately 6:00 that evening, according to her testimony and Bartlett's, she called him and offered to bring him some clothes he had left at her home. They arranged to meet at a convenience store in the Iroquois neighborhood. Rather than walk to the store, Bartlett asked Girton if he could borrow Harris's car, and Harris gave Girton permission to use it. According to both appellants, they first drove to

the store, but thinking that with the car they could drive to Bartlett's grandmother's house before she left, they left the store and drove to her home, which is in the Arcadia neighborhood about a block from Jimenez's apartment. Bartlett's grandmother was not home when the two men arrived. The events which happened next are the subject of dispute.

According to Bartlett's initial statement to the police investigators, the pair decided to ride through the Arcadia neighborhood while they waited for Bartlett's grandmother to return, and because Girton did not have a license Bartlett was driving. They parked in front of Jimenez's building in hopes of meeting a couple of Bartlett's friends. They had not been there long when Girton suddenly told Bartlett to "hold on," and without explaining what he was doing exited the vehicle, hurried across the street, and entered the building. Bartlett was listening to the radio, but looked up a moment later and through a window in the apartment's door saw Girton "tussling" with another man. He pulled the Lexus forward to get a better view, and as he did so a shot rang out. Immediately, Girton came running from the building and jumped into the car, exclaiming that the other man had tried to stab him. Bartlett claimed that he panicked at that point and drove off, back to the Iroquois apartment.

Girton's initial statement was similar. He too claimed that Bartlett was driving and that Bartlett could not have known why he, Girton, suddenly got out of the car. He asserted that some two or three weeks earlier Jimenez had robbed him at knife point behind the Arcadia apartments, and that when he caught sight of his assailant entering the apartment that night he had

4

suddenly decided to retaliate. Girton claimed that when he confronted Jimenez in the foyer of his building, Jimenez reached as though for a weapon, whereupon Girton shot him in the leg and ran away.

The investigators were not satisfied with these statements. Jimenez's relatives had reported that Jimenez, a native of Mexico, had been in the United States for only ten days, which did not jibe with Gorton's account of a prior robbery. Girton stated that he had thrown the gun out the car window during the drive back to Morgan's apartment, but Bartlett claimed that he had not seen the gun and did not know what happened to it. One of the witnesses outside Jimenez's apartment, furthermore, reported that a young man had emerged from the passenger side of the Lexus, stood along the street for couple of minutes, reentered the Lexus, and then, when Jimenez had finished a phone conversation on the porch outside the building and gone inside, had hurried to the building and fired a shot into Jimenez's apartment. According to the witness, the shooter ran back to the street, where the Lexus had pulled up to meet him. He hopped into the waiting car, which then sped off.

The officers confronted both Bartlett and Girton with their suspicions that more was involved than retaliation, and in second statements each young man admitted that the other, at least, had had robbery in mind. Bartlett claimed that while they were driving through Arcadia, Girton had said that he "felt like robbing somebody." Thinking that Girton was just bragging, however, and trying to make himself feel tough, Bartlett had not taken him seriously. Just a few minutes later, Girton told Bartlett to stop the car, ran into the

5

building, struggled with Jimenez, and shot him. But even then, according to Bartlett, he "didn't know what was going on" until Girton got back to the car.

In Girton's second statement, he claimed that robbery was Bartlett's idea, an idea suggested by the fact that Girton had a gun. At first, Girton said, he had not felt "up to" a robbery, but when he saw his former assailant he decided to go through with it. His intention, he said, was to rob Jimenez and to scare him, but when he thought that Jimenez was reaching for a weapon he shot him and fled.

Jimenez was shot in the left hip area and bled to death before paramedics arrived. The police found no evidence that he had been armed.

After the shooting, one of Jimenez's relatives, who had been sitting in her car outside the apartment, followed the fleeing Lexus and got the license number. The next day that led the police to Tanise Harris, who informed them that Girton and Bartlett had borrowed her car for about an hour the previous evening and had returned with it to Morgan's Iroquois apartment. Based in part on her statement and the positive identification of the vehicle at the scene of the crime, officers obtained a search warrant for Morgan's apartment, which they executed at approximately 6:00 p.m. the day after the shooting. In addition to arresting Bartlett, Girton, and Morgan at Morgan's apartment, the police seized a nine-millimeter handgun and ammunition for it, various articles of clothing, a small amount of marijuana, and 2.14 grams of crack cocaine.

In January 2006, a Jefferson County Grand Jury indicted Bartlett for murder, two counts of first-degree robbery, first-degree possession of a

controlled substance (cocaine), tampering with physical evidence, and unlawful transaction with a minor. One of the robbery counts related to a separate incident and was severed from the other charges for trial. In March 2006, following his transfer to circuit court pursuant to KRS 635.020(4), Girton was indicted for murder, first-degree robbery, first-degree possession of a controlled substance (cocaine), tampering with physical evidence, and possession of a handgun by a minor. The two cases were tried jointly in late January and early February 2007.

As noted above, both defendants testified at trial. Bartlett essentially reiterated his second statement to the police. He again admitted that Girton had mentioned wanting to rob someone, but claimed that he responded by informing Girton in no uncertain terms that he wanted no part of a robbery. Girton seemed to accept that decision, Bartlett testified, and so when they parked and Girton suddenly left the car and hurried to Jimenez's building, Bartlett had no idea what Girton was doing and assumed that he knew someone inside.

Girton, however, told an utterly different story at trial. He claimed that he was the driver that evening, not Bartlett, and that when they could not get into Bartlett's grandmother's house, Bartlett had directed him to the Arcadia Apartments, ostensibly to get a key to the grandmother's house from one of Bartlett's cousins. Girton had parked the Lexus, and Bartlett, after looking around for a minute and saying that he would be right back, had walked across the street to the building where his cousin was supposed to live. Girton

claimed that he was listening to the car's radio and rolling a joint when he was startled by the gun shot. Looking up, he saw Bartlett running from the building, so he pulled the car out of the parking space and in response to Bartlett's frantic, "Go, man, go!" had panicked and sped off back to Morgan's apartment. The pair realized that they had been followed and that their license number had probably been recorded. They agreed, therefore, that when the police came Girton, the minor, would "take the case," *i.e.,* would take responsibility for the shooting. His punishment, they hoped, would be much less severe than Bartlett's punishment as an adult. In fact, however, Girton's case was transferred to circuit court and he too was tried as an adult and faced the possibility of a life sentence. That was a risk, Girton testified, that he was not willing to accept for something he had not done.

Unfortunately, neither of the witnesses at the scene could positively identify the shooter, and their descriptions of him were inconclusive. They remembered him as thin and as wearing a blue bandana, which perhaps suggested Bartlett, but they also remembered him as wearing black or dark clothing, which seemed to point to Girton. The Commonwealth argued that it did not really matter which of the two had pulled the trigger, because, as their second, less rehearsed statements to the investigators indicated, both defendants planned and participated in an armed robbery that turned into a wanton murder. The jury was instructed on that theory and was instructed as well on the lesser offenses of second-degree manslaughter and reckless homicide. As noted, the jury found both defendants guilty of robbery and

second-degree manslaughter. We shall begin our analysis with the defendants' claims that the jury should also have been instructed on facilitation.

## ANALYSIS

### I. The Trial Court Did Not Err By Refusing The Defendants' Requests For Facilitation Instructions.

As the parties correctly note, facilitation is a lesser included offense of complicity. Under the facilitation statute, KRS 506.080,

> [a] person is guilty of criminal facilitation when, acting with knowledge that another person is committing or intends to commit a crime, he engages in conduct which knowingly provides such person with means or opportunity for the commission of the crime and which in fact aids such person to commit the crime.

A person is guilty of an offense committed by another person, on the other hand—complicity—when

> [1] with the intention of promoting or facilitating the commission of the offense, he:
> (a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or
> (b) Aids, counsels, or attempts to aid such person in planning or committing the offense; . . . .
> (2) When causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he:
> (a) Solicits or engages in a conspiracy with another person to engage in the conduct causing such result; or
> (b) Aids, counsels, or attempts to aid another person in planning, or engaging in the conduct causing such result.

KRS 502.020. The primary difference between the two offenses is the defendant's state of mind. Whereas complicity requires the same mens rea as

9

the principal offense—intent for complicity to robbery, for example, and wantonness for complicity to second-degree manslaughter—facilitation applies where the defendant knows of and lends assistance to the wrongdoing but without sharing the criminal purpose or otherwise entering into the wrongful conduct, where he remains, in essence, "a knowing, cooperative bystander with no stake in the crime." Monroe v. Commonwealth, 244 S.W.3d 69, 75 (Ky. 2008). *See also* Chumbler v. Commonwealth, 905 S.W.2d 488 (Ky. 1995); Webb v. Commonwealth, 904 S.W.2d 226 (Ky. 1995). A facilitation instruction is authorized if, but only if, the evidence would support a finding of this knowing but "indifferent" assistance. White v. Commonwealth, 178 S.W.3d 470, 490 (Ky. 2005).

In this case, the trial court refused to instruct on facilitation because in its view the evidence tended to show either that both defendants fully participated in the offenses or that one of them was innocent, but not that either of them provided merely knowing aid and cooperation. We agree. The defendants argue that the jury could have believed that the driver knew of but did not share the other's intent to rob, but absent testimony to that effect there must be some other substantial evidence tending to prove the driver's mere cooperation, and we agree with the trial court that there was none. As noted, the defendants' statements and testimony indicated only that they were both involved (Girton's second statement to the investigators), or that the driver "had no idea" what the other was up to.

10

Their testimony distinguishes this case from <u>Webb v. Commonwealth</u>, <u>supra</u>, on which both defendants rely. In <u>Webb</u>, the defendant was accused of being complicit in his girlfriend's drug trafficking. He testified that in the course of giving the girlfriend a ride he learned that a drug transaction was afoot and that although he then knowingly helped her complete the transaction, he did so without having any stake in it or intending it to occur. The other circumstances of the case lent enough plausibility to this testimony, we held, to raise a jury question concerning facilitation.

Here, however, aside from Girton's initial inculpatory statements, both defendants disavowed any knowledge that a crime was taking place, and none of the other circumstances lend support to their claims that the driver knew of but did not intend to further his companion's plan to rob Jimenez with a deadly weapon. On the contrary, the witnesses at the scene described a driver who behaved like a get-away driver, not like an indifferent bystander. It is true, of course, as the defendants argue that the jury was not obliged to accept their testimonies at face value and was free to make its own credibility determinations, but that fact does not authorize the trial court to instruct on "imaginary scenarios" with no evidentiary support. <u>White v. Commonwealth</u>, 178 S.W.3d at 491 (citation and internal quotation marks omitted). The facilitation scenario in this case lacked evidentiary support, and the trial court therefore correctly refused to give facilitation instructions.

## II. The Search Warrant Was Adequately Supported By Probable Cause.

Prior to trial, the defendants moved to suppress their custodial statements on the ground that they derived from an illegal search of Morgan's apartment. The search was illegal, they maintained, because the warrant authorizing it was based on an inadequate showing of probable cause. Both defendants contend that the trial court erred when it denied their motions to suppress.

In addition to identifying Morgan's apartment as the place to be searched and naming the three expected occupants, the requesting officer's warrant affidavit stated that she had learned on November 10, 2005 at 12:10 that the police had responded to a shooting death at Jimenez's apartment and that a witness had reported seeing a subject leave the building immediately after the shooting, place a gun in his waistband, and enter the passenger side of a waiting car with a certain Kentucky license number. The affidavit explained that the license number led to the registered owner, Tanise Harris, and concluded with the statement obtained from Harris that

> she was at 1523 Oneida [Morgan's apartment] last night and [m]et her friend, "J.R.," also known as James Girton. She stated that James moved into the listed address which is leased to Harrison Morgan. Ms. Harris stated that Mr. Girton and his friend, a black male who goes by "Polo," left in her car to go to the store between 1810 and 1840 hours and they returned at approximately 1910 hours.

The defendants contend that because the affidavit fails to state explicitly the date and time of the shooting, it alleges what must be deemed a stale crime, evidence of which was not likely to be found at Morgan's apartment.

12

They also contend that the affidavit fails to establish Harris's reliability and thus that her statement does not lend support to a finding of probable cause.

As the defendants correctly note, a search warrant should not be issued unless the issuing magistrate makes

> a practical, common-sense decision [that], given all the
> circumstances set forth in the affidavit before him . . .
> there is a fair probability that contraband or evidence
> of a crime will be found in a particular place.

Ragland v. Commonwealth, 191 S.W.3d 569, 583 (Ky. 2006) (citing and quoting from Illinois v. Gates, 462 U.S. 213 (1983)). Because probable cause deteriorates over time, one of the factors that must enter into the magistrate's decision is the age of the officer's information. Judged in light of such other circumstances as the type of crime and the permanence of the evidence being sought, information that is too stale to suggest a fair probability that evidence will presently be found does not justify a warrant, however probative the information may have been when it was fresh. *Id.* A warrant affidavit that fails to include enough temporal information to permit the magistrate to assess its staleness is inadequate as a matter of law. United States v. Hython, 443 F.3d 480 (6th Cir. 2006) (affidavit that gave "no clue" when the alleged crime occurred was insufficient).

The defendants contend that the officer's affidavit here was insufficient because it did not state when the shooting took place. It is true that in her description of the crime the requesting officer omitted the date, a detail that should have been included. Warrant applications are often prepared in haste, however, and, as noted above, are to be assessed not according to rigid

13

technicalities but in a practical, common-sense manner taking into account the application as a whole. Here, although the officer did not state explicitly the date of the shooting, the affidavit itself was dated November 10, 2005 and indicated that Harris had loaned her car to the defendants "last night." "Last night," by clear implication, was also when Harris's car had been seen speeding away from the scene of the crime. Although not a model of clarity, perhaps, the affidavit adequately conveyed to the issuing judge when the crime occurred and permitted him to determine that the officer's information was not stale.

Seeking to undermine this conclusion, the defendants also contend that the issuing judge should not have relied on the statement Harris gave to the investigators because the affidavit does not include facts establishing Harris's reliability as an informant. Unlike the anonymous informant in Illinois v. Gates, 462 U.S. 213 (1983), however, the case upon which the appellants rely, the officers knew Harris's identity and questioned her in person, circumstances favoring reliance on her statement. Florida v. J.L., 529 U.S. 266 (2000). Contrary to the appellants' assertions, moreover, Harris's statement that she had loaned her car to Girton and Bartlett was corroborated, for probable cause purposes, by the crime scene witnesses who had positively identified Harris's vehicle in the possession of two young men. The issuing judge did not err, therefore, by taking Harris's statement into account or by issuing the warrant to search Morgan's apartment.

14

## III. Bartlett Is Not Otherwise Entitled To Relief.

### A. There Was Sufficient Evidence To Find Bartlett Guilty Of Robbery.

We turn next to the issues each appellant has raised individually, beginning with Bartlett's. He contends, first, that his robbery conviction cannot stand because the Commonwealth failed to prove that the shooting occurred in the course of a theft or attempted theft. As he correctly notes, the first-degree robbery statute, KRS 515.020, provides in pertinent part that

> (1) A person is guilty of robbery in the first degree when, in the course of committing theft, he uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft and when he:
> (a) Causes physical injury to any person who is not a participant in the crime; or
> (b) Is armed with a deadly weapon.

The Commonwealth was obliged to prove, then, an assault with the intent to accomplish a theft accompanied either by a physical injury to a non-participant or by the assailant's being armed with a deadly weapon.

Bartlett concedes that the evidence establishes an assault and both an injury and a deadly weapon, but he maintains that there was insufficient evidence of a theft or an attempted theft, *i.e.*, there was no evidence that the shooter took any property from Jimenez, nor did any of the witnesses at the scene describe even an attempt to do so. We have previously explained, however, that robbery is primarily an offense against the person and that the theft element is satisfied if the assault is perpetrated with the intent to obtain property "whether any . . . property is actually taken or not." Commonwealth v. Smith, 5 S.W.3d 126, 129 (Ky. 1999) (quoting from Lamb v. Commonwealth,

15

599 S.W.2d 462 (Ky. App. 1979)). A rational juror in this case could have been convinced by Girton's second statement to the police and by the pair's coordinated getaway from the scene that Bartlett and Girton rode through the Arcadia apartments looking for someone to rob and that in furtherance of their plan Girton assaulted Jimenez intending to steal from him. This evidence satisfies the theft element of first-degree robbery, and thus Bartlett is not entitled to relief from his robbery conviction. Commonwealth v. Benham, 816 S.W.2d 186 (Ky. 1991) (noting the standard of review for sufficiency-of-the-evidence challenges).

## B. Bartlett's Unredacted Jailhouse Notes To Girton Were Properly Admitted Into Evidence.

Bartlett next contends that the trial court erred by permitting the introduction of certain items of evidence. He complains first that two notes he wrote to Girton during their incarceration pending trial should have been excluded because they refer to a collateral robbery and to Bartlett's plea negotiations with the Commonwealth. He also complains that various items seized from Morgan's apartment were irrelevant to the Commonwealth's case and should not have been mentioned. Although we agree to some extent with this latter contention, we are convinced that the error was harmless and so not a ground for relief.

As noted above, at trial each defendant pointed the finger at the other and claimed that the shooting took him totally by surprise. Girton attempted to explain away his inculpatory statements to the police by testifying that after the shooting Bartlett talked him into "taking the case." As part of this defense,

16

Girton's counsel asked Bartlett on cross-examination if that was not what happened, and when Bartlett denied urging Girton to take responsibility, counsel had him read to the jury two notes he had written to Girton while they awaited trial. The first note, written in two parts on the front and back of a sheet of paper, stated,

> What's up brah, They bout to offer me some stupid ass deal like 20/85 but if I get it broke down I could get less. If I can get this other robbery off me I'm str8 a lil bit that's where the x-tra 10 yrs iz comin from. They trien to give me the death penalty but you cant get it plus they said you can get less time than me. Just stay to your word and I'm gonna have to testify for you or someethin cuz I gotta get the robbery off of you. My momma wanted to talk to you cuz she has some advice for you. A lot of shit they done to us they cant do but we just gotta fight.

Then on the reverse side:

> I got Sharisha bout to bring some money up here hopefully I can get some this week. My mama just got out the hospital she aint been working cuz she got a blood clot in her leg. But I'm sorry to hear bout your moma. Is she str8? Plus the only reason I aint said nuttin to you is cuz you aint said nottin to me and I b tryin hard to get the g.e.d. shit str8 feel me. Holla back lil Brah. Hunnit.

After Bartlett read this note to the jury, Girton's counsel asked him if he had not been urging Girton to stick with the story they had fabricated after the shooting because he, Bartlett, was facing additional and more serious charges. When Bartlett denied urging Girton to tell anything but the truth, Girton's counsel had him read this second statement to the jury:

> We need to get our story together. I got my side. You just need to write me yours but jus say you just was going to ask [the] dude why he robbed you. He

> reached and you didn't want that to happen again but
> you never intended to kill him.

Bartlett maintains that the admission of these notes was improper because of the references in the first one to a plea offer and to "this other robbery."

The first reference, he contends, violates KRE 410, which prohibits admission of any statements "made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn." As the Commonwealth correctly points out, however, this rule applies only to statements made to the prosecuting authority, not to statements, such as this one, made to a third party. Bratcher v. Commonwealth, 151 S.W.3d 332 (Ky. 2004). Nor does KRE 408 come to Bartlett's aid, for that rule, which addresses evidence of compromise negotiations, expressly allows use of compromise evidence for such purposes "as proving bias or prejudice of a witness." KRE 408(2). The trial court did not err, therefore, by admitting Bartlett's reference to the Commonwealth's plea offer.

Nor did the court err by admitting Bartlett's reference to "this other robbery." Bartlett contends that that reference should have been excluded pursuant to KRE 404(b), which provides in part that evidence of other crimes is not admissible "to prove the character of a person in order to show action in conformity therewith." Again, however, such evidence is admissible to impeach a witness's credibility, Foley v. Commonwealth, 942 S.W.2d 876 (Ky. 1996), provided that it is relevant and probative for that purpose and that its probative value outweighs its prejudicial tendency. Anderson v.

18

Commonwealth, 231 S.W.3d 117 (Ky. 2007). Here, there is no dispute that Bartlett faced an additional robbery charge, so his reference to that charge was probative, and the additional charge was relevant to the impeachment of Bartlett because it added to his reasons for urging Girton to "take the case," as Girton alleged and Bartlett denied. Finally, against the obvious prejudice to Bartlett of being associated with an additional robbery was to be weighed Girton's constitutionally protected interest in presenting a full defense. We cannot say that the trial court abused its discretion by ruling that the probative value to Girton of Bartlett's "other robbery" reference outweighed its prejudicial effect on Bartlett. The trial court did not err, in sum, by admitting Bartlett's notes in their entirety.

### C. Although Mention of Irrelevant Items Seized At Morgan's Apartment Should Not Have Been Allowed, The Error Was Harmless

In addition to arresting Bartlett and Girton, the police officers who executed the search warrant for Morgan's apartment seized, among other things, a nine-millimeter handgun, nine-millimeter and shot-gun ammunition, a small quantity of marijuana, a scale, and 2.14 grams of crack cocaine. Ballistics testing established that the seized gun was not the one used to shoot Jimenez, and though the defendants were both charged with possessing the cocaine, neither was charged with marijuana or paraphernalia offenses. Bartlett moved in limine to exclude any mention of these items as irrelevant to the alleged robbery and killing and as suggestive merely of criminal disposition in violation KRE 404(b). The trial court permitted the arresting officers to itemize during their testimony what was seized as part of the description of the

19

arrest, but it did not allow the Commonwealth to discuss further or to introduce photographs of the ammunition, the marijuana, or the scale. The trial court also admonished the jury that the seized gun was not the gun used to shoot Jimenez. In addition, Harrison Morgan testified that the gun and the cocaine were his and his alone. Bartlett maintains that notwithstanding the limitations imposed by the trial court, the court erred by allowing any mention of the seized gun, the ammunition, the marijuana, and the scale, and by allowing into evidence photographs of the seized cocaine.

With respect to the cocaine evidence, both defendants were charged with possessing the cocaine, so clearly the cocaine evidence was admissible. Evidence of the uninvolved gun, the ammunition, the marijuana and the scale, however, should have been excluded. Although "KRE 404(b)(2) is intended to be flexible enough to permit the prosecution to present a complete, un-fragmented, un-artificial picture of the crime committed by the defendant, including necessary context, background and perspective," Major v. Commonwealth, 177 S.W.3d 700, 708 (Ky. 2005) (citation and internal quotation marks omitted), contextual evidence does not extend to "weapons which have no relation to the crime." Brewer v. Commonwealth, 206 S.W.3d 313, 324 (Ky. 2006) (citation and internal quotation marks omitted). Likewise the Commonwealth was not prepared to link either the marijuana or the scale to either defendant, and evidence concerning the marijuana and scale was not necessary to an adequate understanding of the context of the charged offenses. We agree with Bartlett, therefore, that the trial court erred by admitting even

20

limited evidence concerning the uninvolved gun, the ammunition, the marijuana and the scale.

Bartlett is not entitled to relief, however, notwithstanding the error, because we are convinced that the error was harmless. RCr 9.24. An evidentiary error will be deemed harmless, we have held, if there is no "reasonable possibility that the evidence complained of might have contributed to the conviction." Anderson v. Commonwealth, 231 S.W.3d at 122 (citations and internal quotation marks omitted). Here both defendants were acquitted of the cocaine charge, so the improper cocaine evidence was harmless in that respect. Otherwise, the evidence was conclusive that a firearm was used in the attack upon Jimenez, and Tenise Harris testified that she had seen Girton in possession of handgun just three or four days prior to the shooting. The improper evidence had no bearing whatsoever, therefore, on the jury's determination that a firearm was involved. The principal issues in this case, rather, were whether that shooting was part of a robbery and whether the driver was complicit in the offenses. Those issues were addressed primarily by the defendants' custodial statements, their testimonies, and by the testimonies of the witnesses at the scene. Again, because a gun clearly was involved and drugs were not, there is simply no possibility, reasonable or otherwise, that the improperly admitted evidence tipped the scales on those issues. Nor, given the fact that the jury acquitted the defendants of murder and opted for one of the lesser included offenses instead, is there a reasonable possibility that the

21

improper evidence contributed to an unduly harsh penalty. The evidentiary error was harmless, in sum, and so does not entitle Bartlett to relief.

**D. The Investigator Did Not Improperly Induce Bartlett's Second Custodial Statement.**

Finally, Bartlett contends that his second statement to the investigators should have been suppressed because it was induced by an improper promise of leniency. The second statement was the one in which Bartlett admitted that Girton had spoken of wanting to rob someone, but Bartlett claimed that he did not take seriously what he regarded as a mere boast. Toward the end of that statement Bartlett explains that he decided to amend his first statement "just to be truthful, just to be truthful and, uh, [so] that you would help me as best as you can." The interview then continued as follows:

> Detective: [So] that I would tell the prosecutor that you cooperated and that you told the truth?
> Bartlett: Yeah.
> . . . .
> Detective: I told you that, uh, that the prosecution aspect was out of my hands. Is that correct?
> Bartlett: Yeah.
> Detective: That I have nothing to do with who gets how much time or anything like that . . is that correct?
> Bartlett: Yeah.

Bartlett maintains that the detective's promise of help improperly induced his statement. It is clear from the portion of the statement just quoted, however, that the detective promised Bartlett nothing but to tell the prosecutor that he had cooperated. In Peak v. Commonwealth, 197 S.W.3d 536, 542 (Ky. 2006), we held that such a promise "does not render the confession involuntary." Bartlett, therefore, was not entitled to the suppression of his second statement.

22

## IV. The Trial Court Did Not Improperly Limit Girton's Right To Participate In *Voir Dire.*

Girton, finally, contends that the trial court erred by not allowing him to participate in the individual *voir dire* portion of jury examination. We disagree.

As noted above, the Commonwealth sought the death penalty against Bartlett, but because Girton was a minor at the time of the offense he was not subject to capital punishment. In a capital case, the jury selection process includes questioning concerning the prospective jurors' ability to consider the entire range of authorized sentences, including death, and those members of the venire whose beliefs or attitudes would prevent or substantially impair the performance of their duty to follow the law may be excused. In Kentucky, of course, the same jury considers both the guilt and sentencing phases of a defendant's trial. The United States Supreme Court has held that in a joint trial with both capital and non-capital defendants, this "death qualification" of the jury that will consider both guilt and sentencing does not violate the non-capital defendant's right to an unbiased jury. Buchanan v. Kentucky, 483 U.S. 402 (1987).

Under our jury selection procedures,

> [w]hen the Commonwealth seeks the death penalty, individual voir dire out of the presence of other prospective jurors is required if questions regarding capital punishment, race or pretrial publicity are propounded. Further, upon request, the Court shall permit the attorney for the defendant and the Commonwealth to conduct the examination on these issues.

RCr 9.38. In this case, because the Commonwealth was not seeking the death penalty against Girton, the trial court did not allow his counsel to propound questions during individual *voir dire*. Girton appears to maintain that because his counsel was thus prevented from arguing against the removal of certain members of the panel, he was denied his right under the rule to participate fully in jury selection. He also asserts in a conclusory manner that he was denied his constitutional rights to an unbiased jury and to due process, but without more developed arguments explaining how those rights may have been compromised, we decline to address the constitutional issues except to note that they appear to be foreclosed by the Supreme Court's decision in Buchanan.

With respect to RCr 9.38, we agree with the trial court that inasmuch as a non-capital defendant has no interest in the "death qualification" of the jury, the rule does not give him a right to propound questions regarding capital punishment. *See* United States v. Sanchez, 75 F.3d 603 (10th Cir. 1996) (holding that a non-capital codefendant could be denied participation in the "death qualification" portion of *voir dire*). On the other hand, a non-capital defendant has an interest in and a right to explore the jury's attitudes toward race and its exposure to pretrial publicity. The rule does not prevent the trial court from permitting a non-capital defendant to participate in individual *voir dire* on those topics, and if individual *voir dire* is not allowed, the non-capital defendant must be permitted to pursue them during general *voir dire*.

24

Girton does not complain, however, that he was denied an opportunity to examine the venire regarding race or pretrial publicity. He complains, rather, that during individual *voir dire* the trial court excused three jurors for hardships—a sick child, a hearing impairment, and a mental disability—without according him (or any of the other parties) an opportunity to object. Hardship excusals, however, "are within the discretion of the trial judge, . . . and are not required to be decided in open court or in the presence of or in consultation with any parties or their counsel." Soto v. Commonwealth, 139 S.W.3d 827, 852 (Ky. 2004) (citing Admin. Proc., Part II, § 12(1)). Because these excusals do not implicate RCr 9.38, and because Girton has failed to demonstrate how they might have compromised his constitutional rights, he is not entitled to relief on this ground.

## CONCLUSION

In sum, the jury found that the defendants undertook to rob Adolfo Jimenez and that in the course of doing so they wantonly shot and killed him. Both defendants admitted being present at the shooting, and both acknowledged that shortly before the shooting the subject of robbery had been broached. Girton, of course, acknowledged much more than that. In his second statement to the police, Girton maintained that the pair jointly intended to rob Jimenez and that he was shot as Girton attempted to carry out that intent. The surrounding circumstances were consistent with that scenario, and accordingly the trial court correctly gave jury instructions charging both defendants with robbery and the different degrees of homicide. Because no

25

evidence suggested that either defendant knowingly assisted the other to commit the crimes without intending to further them, the trial court correctly declined to give facilitation instructions. The court also correctly declined to suppress the defendants' custodial statements. The affidavit which preceded the search warrant was sufficient to dispel any notion that the information was stale and permitted a meaningful probable cause determination. Bartlett's second statement, moreover, was not tainted by the officer's promise to tell the prosecutor that Bartlett had cooperated, a legally permissible promise that does not render the statement involuntary. Although the trial court should not have permitted mention at trial of a gun, ammunition, marijuana and a scale with no connection to the charged crimes, these errors are utterly unlikely to have had any bearing on the outcome, and so do not justify relief. Finally, Girton was not entitled under RCr 9.38 to participate in the "death qualification" portion of *voir dire,* and he has not shown that otherwise his inability to object to three hardship excusals violated in any way his right to an unbiased jury or to the due process of law. Accordingly, in both 2007-SC-000289-MR (Girton) and 2007-SC-000293-MR (Bartlett), we affirm the March 26, 2007 Judgments of the Jefferson Circuit Court.

All sitting. All concur.

26

COUNSEL FOR APPELLANT,
JAMES ROBERT GIRTON:

Francis William Heft, Jr.
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Elizabeth B. McMahon
Assistant Public Defender
Office of the Jefferson District
Public Defender
200 Advocacy Plaza
717-719 West Jefferson Street
Louisville, KY 40202


COUNSEL FOR APPELLANT,
DRASHAWN BARTLETT:

Kathleen Kallaher Schmidt
Appeals Branch Manager
Department of Public Advocacy
100 Fair Oaks Lane, Suite 301
Frankfort, KY 40601-1109


COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

Bryan Darwin Morrow
Office of the Attorney General
1024 Capital Center Drive
Frankfort, KY 40601