Phillip BRATCHER, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee.

and

Mark Bratcher, Appellant

v.

Commonwealth of Kentucky, Appellee.

Nos. 2009–CA–001084–MR,
2009–CA–001085–MR.

Court of Appeals of Kentucky.

Nov. 2, 2012.

Rehearing Denied Jan. 17, 2013.

Discretionary Review Denied by Supreme
Court Sept. 18, 2013.

M. Brooke Buchanan, Assistant Public Advocate, Frankfort, KY, for appellant Phillip Bratcher.

Brian Thomas Ruff, Assistant Public Advocate, Frankfort, KY, for appellant Mark Bratcher.

Jack Conway, Attorney General of Kentucky, Gregory C. Fuchs, Assistant Attorney General, Frankfort, KY, for appellee.

Before KELLER, NICKELL and STUMBO, Judges.

## OPINION

NICKELL, Judge:

Phillip Bratcher[1] and his brother, Mark Bratcher, were jointly tried and convicted of the 1999 for-profit strangulation death of Susan Andrew in Louisville, Kentucky. Mark faced the death penalty; Phillip did not. Both men seek to overturn their intentional murder[2] convictions due to ineffective assistance of counsel under RCr[3]

---

1. To avoid confusion, the appellants will be referred to by their first names.

2. Kentucky Revised Statutes (KRS) 507.020(1).

3. Kentucky Rules of Criminal Procedure.

11.42. Having thoroughly reviewed the extensive record, we affirm both orders denying relief.

## FACTS

A jury tried this case November 2–26, 2001, in Jefferson County, Kentucky. A synopsis of the trial can be found in *Bratcher v. Commonwealth*, 151 S.W.3d 332, 338–40 (Ky.2004), wherein the Supreme Court of Kentucky affirmed Mark's conviction and sentence of life imprisonment without the possibility of parole. Phillip did not file a direct appeal, having accepted the Commonwealth's offer of a 25–year sentence prior to the penalty phase in return for his willingness to testify against Mark at any future hearings regarding the murder and his waiver of the right to appeal all issues. During the guilt phase of trial, Phillip had waived his right not to testify in return for the Commonwealth's agreement not to seek the death penalty against him.

Suffice it to say, Ms. Andrew died from strangulation a short time after learning that Mark, with whom she was romantically involved and who was severely in debt, had been unfaithful to her and she had decided to stop providing financial support to him. Phillip testified at trial that he accompanied Mark to the victim's home the night of August 28, 1999, to mediate a dispute, but exited the house before anything untoward happened. Phillip claimed he knew nothing of a murder until police questioned him about Mark a few days later. In contrast, Mark testified he spent the night of August 28, 1999, in Phillip's trailer in Kokomo, Indiana, after moving his ex-wife and daughters to a new home and thought it odd when he could not reach Ms. Andrew by telephone. Mark insisted he had not killed Ms. Andrew and claimed he did not know she had named him as a beneficiary on several life insurance policies. When the victim failed to return to work after the weekend, her daughter went to her home and found her dead body on the basement steps.

## MOTIONS TO VACATE

On January 29, 2004, Phillip filed a *pro se* motion to vacate his conviction alleging he had received ineffective assistance of counsel from his appointed trial attorneys due to: flawed jury instructions; the introduction of DNA evidence that was illegally obtained due to his questionable competency; failure to argue facilitation;[4] failure to investigate the Commonwealth's aggravating factor; and counsel's bad advice that he waive his right not to testify during the guilt phase of trial and that he accept the Commonwealth's recommendation of a 25–year sentence during the penalty phase of trial. A daylong hearing was held on the motion on March 10, 2006, at which Phillip and his trial attorneys, Hon. Ray Clooney and Hon. Michael Bufkin of the Capital Trial Unit of the Louisville Metro Public Defender's Office, testified. Post-conviction counsel supplemented Phillip's original *pro se* motion to emphasize counsel should have fought for clearer jury instructions and should not have advised Phillip to testify as he did at trial. On March 31, 2009, the trial court entered an order denying relief and finding each of Phillip's allegations could be resolved by reviewing the record. The court also found each of the allegations could have been raised on direct appeal and therefore could not be addressed on collateral attack.

On January 18, 2005, Mark filed a *pro se* motion to vacate his conviction alleging he received ineffective assistance of counsel when his defense team failed to: challenge the sufficiency of the indictment; investi-

4. KRS 506.080.

gate, prepare and present a defense; contact or call witnesses he had suggested; challenge Phillip's competency and the admissibility of his testimony; preserve multiple issues for appeal; and give a coherent closing argument. Several months later, appointed counsel filed a supplemental motion to vacate arguing Mark's defense team was ineffective in not hiring a mental health expert to evaluate Phillip and in not challenging Phillip's competency. An evidentiary hearing was held on the motions on November 3, 2009, at which Mark; his retained trial attorneys, Hon. Dennis Olgin and Hon. Scott Byrd; a mitigation expert; and two of Mark's daughters, testified. On March 31, 2010, the trial court entered a nine-page order denying the motion to vacate and finding Mark had not demonstrated ineffective assistance of counsel.

Both men have appealed the orders denying RCr 11.42 relief. We have designated the appeals to be heard together and affirm.

### LEGAL ANALYSIS

"RCr 11.42 provides a procedure for a motion to vacate, set aside or correct sentence for 'a prisoner in custody under sentence or a defendant on probation, parole or conditional discharge.' It provides a vehicle to attack an erroneous judgment for reasons which are not accessible by direct appeal." *Gross v. Commonwealth,* 648 S.W.2d 853, 856 (Ky.1983). To prevail on an RCr 11.42 motion, the movant must convincingly establish he was deprived of some substantial right justifying the extraordinary relief afforded by the postconviction proceeding. *Dorton v. Commonwealth,* 433 S.W.2d 117, 118 (Ky.1968).

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), states the standard by which we measure ineffective assistance of counsel claims. To be deemed ineffective, counsel's performance must fall below an objective standard of reasonableness and be so prejudicial as to deprive the defendant of a fair trial and a reasonable result. *Id.,* at 687, 104 S.Ct. 2052. The United States Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct[,]" preferring instead to emphasize that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003) (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052). "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *United States v. Morrow,* 977 F.2d 222, 229 (6th Cir.1992) (quoting *Strickland,* 466 U.S. 668, 104 S.Ct. 2052), *cert. denied,* 508 U.S. 975, 113 S.Ct. 2969, 125 L.Ed.2d 668 (1993). The critical issue is not whether counsel erred, but whether counsel was so "manifestly ineffective that defeat was snatched from the hands of probable victory." *Id.*

In considering an ineffective assistance of counsel claim, we focus on the totality of the evidence presented to the jury and assess counsel's overall performance throughout the case to determine whether the alleged acts or omissions overcome the strong presumption that counsel rendered reasonable professional assistance. *Strickland; see also Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). In our analysis, we recognize that many of counsel's actions may have resulted from the exercise of sound trial strategy. *Simmons v. Commonwealth,* 191 S.W.3d 557, 561–62 (Ky.2006), *overruled on other grounds by Leonard v. Commonwealth,* 279 S.W.3d 151 (Ky.2009). A defendant is not guaranteed errorless counsel, nor counsel judged ineffective by

hindsight, but counsel likely to render reasonably effective assistance. *McQueen v. Commonwealth*, 949 S.W.2d 70 (Ky.1997), *cert. denied*, 521 U.S. 1130, 117 S.Ct. 2536, 138 L.Ed.2d 1035 (1997).

In evaluating counsel's failure to raise a defense, we must determine if the failure was a tactical choice by counsel and, if not, whether there was a reasonable probability the result would have been different had it been raised. *Hodge v. Commonwealth*, 68 S.W.3d 338, 344 (Ky.2001); *see also Wiggins*. In evaluating counsel's failure to object, we are mindful that counsel is not required to make useless objections and failure to do so is not ineffective assistance of counsel. *See Commonwealth v. Davis*, 14 S.W.3d 9, 11 (Ky.1999). It is with the foregoing in mind that we review each appeal.

### PHILLIP'S APPEAL

Phillip alleges his legal defense team did not: 1) object to erroneous jury instructions, ask that facilitation be defined, and seek a less confusing instruction on facilitation; 2) allow him to testify as he desired and thereby develop a facilitation defense; and 3) investigate the Commonwealth's proof that the murder was committed for-profit making him death-eligible. The rest of the story, much of which came to light during the hearing on the motion to vacate, is needed to place these claims in context and to evaluate whether trial counsel made reasonable choices and sound strategic decisions in avoiding a capital sentence for their client.

Ms. Andrew was killed in August of 1999, but no one was indicted for her murder until April of 2000 when Phillip and Mark were both charged with intentional murder as either principals or accomplices. The Commonwealth's theory of the crime was that Mark was deeply in debt and had promised to share with Phillip a portion of the money he expected to receive upon Ms. Andrew's death as a named beneficiary on several of her life insurance policies. Phillip's expectation of money was supported by a handwritten note found in a journal seized during a search of his trailer. The note began with the figure $25,000.00 and listed several items (*i.e.*, a Harley Davidson, two cars, clothing, etc.) with a cost for each. After his conviction, Phillip characterized this document as a "wish list" of items he planned to buy upon receiving a grant for which he had applied. He had mentioned this grant to his attorneys prior to trial but they were unable to locate any usable documentation and a request for proof from April,[5] Phillip's wife, yielded no helpful evidence.

Police originally focused on Mark, believing the crime to have been highly personal to him because Ms. Andrew had just learned he was seeing Melissa Hudson and Ms. Andrew had told friends she was going to cease giving Mark money. Despite their best efforts, police could not link Mark to the murder.

Mark claimed he had been with Phillip in Indiana at the time of the murder and Phillip corroborated Mark's story. On January 12, 2000, after telling police for the third time that neither he nor Mark had been in Louisville on August 28, 1999, detectives asked Phillip if he would give a blood sample. Phillip saw nothing unusual about the request and voluntarily signed a consent to search form[6] allowing his blood

---

**5.** April's status is confusing. She may have been a girlfriend at the time of the murder that Phillip subsequently married and divorced. She could not be located at the time of trial, perhaps having run off with another man.

**6.** During a suppression hearing, Phillip testified his consent had been coerced but ulti-

to be drawn at an Indiana hospital. Analysis of Phillip's blood confirmed his DNA matched skin scrapings retrieved from under the victim's fingernails. Phillip's DNA became the Commonwealth's strongest physical evidence because it placed Phillip, but only Phillip, with the victim at the time of her death.

The Commonwealth still needed to link Mark to the murder. Upon learning his DNA had been found under Ms. Andrew's fingernails, on April 14, 2000, Phillip gave a recorded statement to police admitting he accompanied Mark to Louisville on the night of the murder, but only to mediate a dispute between Mark and Ms. Andrew. He claimed that when he left the victim's home she was alive and well. Phillip's recorded statement became an important piece of evidence for the Commonwealth and ultimately a valuable bargaining chip for Phillip's attorneys.

Phillip, a veteran living on disability benefits and caring for his terminally ill mother with no axe to grind against Ms. Andrew, sought to portray himself as merely a facilitator of the murder, not as a principal or accomplice. He believed jurors would convict him of facilitation because by failing to help Ms. Andrew when the dispute with Mark turned physical, he unwittingly helped Mark. Clooney, Phillip's lead attorney, testified at the RCr 11.42 hearing that he did not believe the jury would have convicted Phillip of facilitation, but he did believe the Commonwealth had elicited sufficient evidence to justify giving a facilitation instruction. Clooney went on to explain he "floated" the facilitation theory hoping that if the court denied the instruction, the conviction, which he be-

lieved was certain, would be overturned on appeal. He was surprised when the court granted the instruction. Clooney further explained that posturing the case for a successful appeal was not the goal because that would simply result in retrial. Avoiding a capital sentence for Phillip was Clooney and Bufkin's ultimate goal.

In the run up to trial, the Commonwealth made several offers to Phillip including recommended prison terms of 45, 35, and finally 25 years in return for his guilty plea to murder. The Commonwealth never offered a deal for a plea to facilitation. Phillip rejected each offer. As trial neared, the Commonwealth needed to introduce Phillip's taped statement to place Mark at the scene and offered to eliminate capital sentencing from consideration in return for Phillip's testimony. Clooney and Bufkin were elated with this deal and urged Phillip to accept it. The deal did not require Phillip to testify in any particular way, it only made him subject to the call and cross-examination of any party. Clooney and Bufkin saw this as an "amazing" deal since it removed all three capital sentences [7] from the jury's consideration and allowed Phillip (and the Commonwealth) to point the finger at Mark even though it was Phillip's DNA that was found under the victim's fingernails, a fact that may have led jurors to believe Phillip was the "hands on" strangler. Shifting blame to Mark paved the way for Phillip to seek a facilitation instruction and ultimately to argue in closing that Phillip should be exonerated entirely. It may also have saved Mark from a death sentence since the jury probably thought Phillip was the actual killer and Mark merely profited from the killing. Without

mately abandoned this story and admitted it was a lie.

**7.** Death, life without parole, and life without parole for 25 years. With these penalties

removed from consideration, Phillip faced a maximum penalty of life which Bufkin testified was 50 years at the time of trial in 2001.

the deal, Clooney believed both brothers would have been sentenced to death and strongly doubted either would have walked out of the courtroom with the minimum sentence of 20 years. Bufkin acknowledged he probably told Phillip that Mark would not be convicted without Phillip's testimony. All the pros and cons of accepting the deal were discussed with Phillip and he ultimately chose to accept it. A written waiver was signed and entered in open court.

Clooney testified he never regretted advising Phillip to testify at trial. Neither Clooney nor Bufkin knew what Phillip would say when he took the witness stand—even after trial they were uncertain what had transpired the night of the murder—they simply encouraged Phillip to tell the truth with the hope that jurors would recognize the ring of authenticity in his voice and believe him. Having told several conflicting stories, Phillip's attorneys warned him that no matter how he testified, he would be cross-examined and impeached with his prior statements. Phillip's attorneys pointed out inconsistencies in his stories, but never told him how to testify. Bufkin recalled Phillip becoming angry when they challenged his statements during their discussions. Bufkin stated he frequently told Phillip things he did not want to hear.

Clooney testified he did not care how Phillip testified, but advised him the greater the variation between his trial testimony and his prior statements, the more likely the jury would disbelieve him. Clooney was frank in his discussions with Phillip, telling him what he *needed* to hear as

opposed to what he *wanted* to hear. He told Phillip he might get a facilitation instruction but it depended entirely on how he testified. If his testimony mirrored his April 2000 taped statement, it could be argued that Phillip was not guilty at all. Otherwise, facilitation could be a fall-back position if jurors believed Phillip was more involved than he had admitted in his statement, such as serving as a lookout and lying to police. Counsel never promised a specific verdict.

Phillip's defense team poured over more than 2,000 discovery documents. In preparing for trial, Bufkin met with Phillip a minimum of 19 times, often with Clooney, but sometimes alone. Clooney had notes from eight specific client meetings lasting from 15 minutes to two hours. The attorneys discussed all the evidence with Phillip and shared the discovery with him. In particular they discussed: the DNA evidence, its collection, and how to attack it; a "sloughing" theory to explain the transfer of Phillip's DNA to the victim; while the defense did not conduct its own testing of the DNA, a defense expert had reviewed the Commonwealth's DNA analysis and assured counsel there was no basis for challenging the results; suppression of the taped statement Phillip had given to police on April 14, 2000; the effect of seeking a separate trial[8] from Mark; all plea offers; Phillip's family, military and work history; interviews of family members with a mitigation expert; Mark's role in the murder; deposing Phillip's mother;[9] the facilitation and complicity statutes; and the range of punishment for murder and facilitation. Motions were filed to suppress Phillip's

---

8. Mark had already moved for a separate trial.

9. Phillip's mother's deposition was taken, but not introduced at trial and is not part of the trial record. A letter from her doctor dated August 2, 2001, stated she was suffering from

lung cancer with brain metastases; was unable to travel; being deposed, even at home in Indiana, would be a hardship; and, the accuracy of her statements would be suspect due to her medical condition.

blood sample and items seized during execution of a search warrant at his trailer. Both motions were vigorously argued and denied.

Jurors were instructed they could acquit Phillip, find him guilty of Susan Andrew's intentional murder by "acting alone or in complicity with" Mark, or convict him of criminal facilitation to murder. Since the word "complicity" appeared in the intentional murder instruction, it was defined in the instructions, as were the terms "intentionally" and "knowingly." The facilitation instruction allowed conviction if jurors believed Phillip accompanied Mark to the victim's home "with knowledge that Mark Bratcher intended to commit a crime" and that Phillip's presence in the victim's home "provided Mark Bratcher with the means or the opportunity to commit the crime of murder and in fact aided Mark Bratcher in the commission of the crime;"

AND D. That Mark Bratcher intentionally killed Susan Andrew by strangling her with a rope.

Clooney's tendered instruction on reasonable doubt was denied.

The jury received the case at 12:36 p.m. on November 26, 2001. At 2:06 p.m., jurors sent the court the following handwritten question:

We need further clarification on instructions 1 & 2 for Phillip Bratcher?

The court convened the attorneys and both defendants to discuss the request. The Commonwealth suspected jurors were confused about the difference in complicity and facilitation—a distinction the prosecutor said confuses even learned attorneys. Clooney agreed the two concepts are confusing, but noted that in its closing argument, the Commonwealth had explained the distinction in the two terms as the difference between intent and knowledge. Clooney argued that any jury confusion would have been avoided had the court given the reasonable doubt instruction he had tendered. Upon bringing the jury back to the courtroom, the foreman stated,

[w]e needed clarified whether Instruction 2 means that he did not have his hands on uh, on the murder weapon, that he did not, is that what part (D) of Instruction 2, is that what that means? And if Instruction 1 means that he did have his hands on the murder weapon?

After the jury was excused from the courtroom, the Commonwealth suggested the court reread the definition of complicity to the jury because that appeared to be their point of confusion—in the prosecutor's view, the jury believed Phillip was guilty of something and was trying to decide of which crime they should convict. The prosecutor went on to say he assumed the jury believed Mark had his hands on the rope and were trying to determine whether Phillip had to have his hands on the rope to be found guilty. Clooney said he believed the answer to the jury's question was "Yes" because if Phillip had his hands on the rope, he would be guilty of complicity as opposed to criminal facilitation since "that would constitute major participation in the act of killing." Clooney again implored the court to instruct jurors that facilitation is a lower degree of crime and if they had any reasonable doubt they should convict Phillip of facilitation, the lesser offense. The court again declined to so instruct the jury. Ultimately, the court did not answer the jury's question but instead directed them, in writing, to "continue to deliberate based upon the evidence and the Court's Jury Instructions."

The jury returned its verdict for both men at 4:35 p.m. Immediately upon returning to the courtroom, and before the verdict was handed to the judge, the foreman indicated a "clerical error" had been made—verdict forms had been signed finding Phillip guilty of both intentional mur-

der and criminal facilitation. Upon the court's questioning of the foreman, it was determined he had mistakenly signed the criminal facilitation verdict form and had marked through his signature and the date and initialed the change before jurors entered the courtroom. Polling of all jurors confirmed they intended to convict Phillip of intentional murder.

The morning the penalty phase was to begin, the Commonwealth offered to recommend a sentence of 25 years for Phillip in return for his willingness to waive his Fifth Amendment right not to testify, to testify against Mark at any future proceedings regarding Ms. Andrew's murder, and to waive all appeals. Clooney and Bufkin explained to Phillip the impact of waiving his right to appeal and considered this to be a good deal—the Commonwealth was willing to recommend just five years more than the minimum sentence of twenty years, which was significant because the victim was highly sympathetic and counsel believed the jury would punish Phillip harshly—probably more harshly than Mark—since it was Phillip's DNA that was found under Ms. Andrew's fingernails. Phillip accepted the deal, and as he had done when he waived his right not to testify during the guilt phase of trial, executed a waiver in open court following a colloquy stating he was acting freely and voluntarily and only after full consultation with his attorneys and a complete understanding of his actions. Those waivers are inconsistent with Phillip's current claim that he did not fully understand the waivers nor their ramifications.

At the hearing on the motion to vacate, counsel reiterated their belief that this was a good deal in light of the jury having sentenced Mark to life without parole. Clooney identified several items that could have been raised on appeal, but admitted they would not have required reversal for a new trial, and in light of the evidence, avoiding a death sentence was the main goal. It is against this backdrop that we address Phillip's allegations.

■ We begin with a comment on that portion of the trial court opinion citing *Wahl v. Commonwealth*, 396 S.W.2d 774, 775 (Ky.1965), and suggesting Phillip's claims cannot be raised via RCr 11.42 because they could have been, but were not, raised on direct appeal. When Phillip accepted the Commonwealth's offer of a 25-year sentence, he specifically waived his right to appeal all trial errors. However, he did not waive his right to challenge the actions of his attorneys. A direct appeal being "unavailable" to Phillip due to his waiver, review of his allegations of attorney ineffectiveness is appropriate at this juncture. *Gross*, 648 S.W.2d at 857.

■ Phillip's first allegation is that counsel allowed the case to be submitted to the jury with flawed instructions. Specifically, he argues "facilitation" should have been defined because the word appeared in the definition of "complicity." We disagree. The definition of complicity given by the trial court mirrored both KRS 502.020(1)(a) and (b) and the pattern instruction printed in W.S. Cooper, *Kentucky Instructions to Juries* § 10.01 (Anderson 1999). Giving a statutory pattern instruction is not error. *Parker v. Commonwealth*, 952 S.W.2d 209, 212 (Ky. 1997); *Wells v. Commonwealth*, 892 S.W.2d 299, 303 (Ky.1995). While it was necessary to define "complicity" because that term appeared in the intentional murder instruction and was not explained elsewhere, it was unnecessary to give a separate definition of "facilitation" because that would have duplicated the instruction on facilitation which closely followed the language of KRS 506.080 and the evidence. Furthermore, while the word "facilitating" appears in the definition of "complicity,"

contrary to Phillip's claim, the word "facilitation" does not. Jurors clearly understood they had a choice between two crimes (intentional murder and criminal facilitation of murder) if they believed Phillip played a role in Ms. Andrew's death—this was evidenced by their request for clarification and their erroneous signing of both verdict forms.

■■ Facilitation is a lesser-included offense of complicity. *Luttrell v. Commonwealth*, 554 S.W.2d 75, 79 (Ky.1977). Both crimes have the same elements, the only distinction being the accused's state of mind. To convict Phillip of complicity to intentional murder, the jury had to find he intended Ms. Andrew to die; to convict him of criminal facilitation of murder, they had to find only that he knew Mark "was going to commit a crime." *Chumbler v. Commonwealth*, 905 S.W.2d 488, 499 (Ky. 1995). While the distinction in these two concepts may be subtle, that is the framework within which we must work because those are the statutes the legislature has enacted. The prosecutor distinguished the two terms during his closing argument which Clooney recognized and mentioned when the court was deciding how to respond to the jury's request for clarification.

We have reviewed defense counsel's actions as they pertain to seeking instructions that would reflect the evidence and benefit Phillip. Clooney successfully "floated" the idea of a facilitation instruction. He also tendered an instruction on reasonable doubt, which was rejected, and reiterated his argument in favor of it when jurors sought clarification during their deliberations. In light of Phillip's DNA being found under the victim's fingernails and his telling of multiple versions of the crime, we see no way the verdict would have been any different and, therefore, cannot deem counsel's actions regarding the instructions anything but reasonable under *Strickland*.

■ Phillip's next contention is that counsel prohibited him from testifying as he desired and thus prevented him from mounting a facilitation defense. At the outset, we note first that jurors were instructed on criminal facilitation. Since instructions are based on the testimony, his facilitation theory was obviously presented to the jury. *Thomas v. Commonwealth*, 170 S.W.3d 343, 348–49 (Ky.2005). Second, Phillip was called to the stand by the Commonwealth—he did not testify during his own case-in-chief. Thus, his testimony was sculpted by the Commonwealth's questioning which included the playing of the taped statement he had given police on April 14, 2000. Had he chosen to tell a story that differed from his taped statement, it would not have helped his cause and would have punctuated the lies he had already told. On cross-examination, Clooney asked Phillip a single question—"Phillip, on the evening of August 28, 1999, did Susan Andrew's hands ever come in contact with your skin?" Phillip responded that she had hugged him and then while she flailed at Mark, her hands hit Phillip's face and nearly knocked his glasses off. This was counsel's attempt to minimize Phillip's role, but explain how his DNA was found under the victim's nails. Once Phillip had testified, there was little else counsel could do.

Phillip's claim of ineffectiveness was wholly contradicted by Clooney and Bufkin who testified they rehearsed Phillip's testimony with him but never told him what to say or not say. They pointed out inconsistencies in Phillip's multiple versions of the night of the murder and prepared him for rigorous questioning by both the Commonwealth and by Mark. Because of his prior statements, no matter what he said, he

would have been branded a liar—and he was.

Before Clooney and Bufkin were assigned to the case, Phillip had already given police two very different accounts of August 28, 1999. At first, he claimed he was at his trailer in Indiana the entire night and Mark was with him. But, after learning his DNA had been found under the victim's fingernails, Phillip told a different story—admitting he had traveled to Louisville with Mark that night to mediate a dispute with Ms. Andrew, separated the two when their quarrel became physical, and stepped outside, at Mark's request, after things had calmed down. A short while later, Mark returned to the vehicle, said everything had been resolved, and the brothers headed back to Indiana. Phillip maintained Ms. Andrew was alive when he exited her home.

According to Phillip's testimony at the RCr 11.42 hearing, he wanted to tell a third version at trial, but his attorneys discouraged him from telling the truth. He wanted to testify that he had travelled from Indiana to Kentucky with Mark on August 28 to move a couch in exchange for $50.00 and a bottle of pills. En route to Radcliff, Kentucky, they stopped at a home in Louisville so Mark could retrieve some of his belongings after ending a relationship with a woman. Mark had said the woman was at a revival and not at home, but shortly after Phillip entered the house, she surprised him and both began to scream. As Phillip struggled with Ms. Andrew and tried to calm her, she fell to the floor. At that moment, Mark entered the room and began kicking her in the head. Phillip froze. With his back to Phillip, Mark jerked the victim up and threw her into a room or closet. The brothers then returned to Indiana where Mark showed Phillip a list of times and events he was to remember and if anyone asked, Phillip was to say Mark had been with him the entire time in Kokomo. According to Phillip, if he did not provide Mark the desired alibi, he risked harm befalling their mother or April.

Phillip alone alleges counsel prevented him from telling the story he wanted to tell at trial. A letter Phillip wrote to Mark in advance of trial, and quoted in the Supreme Court's opinion affirming Mark's conviction on direct appeal, shows Phillip had a perfect grasp of the Commonwealth's offer and his predicament:

> What I'm going to write has to stay between us regardless of who may ask you anything about anything okay? First Butler [Assistant Commonwealth Attorney] says to my lawyers if I give them a story they can believe he'll give me 25 years. But if I don't get up and testify the same way in court he'll give me life without parole.... He says if I don't give a statement than (sic) I'll die and you'll walk.

*Bratcher*, 151 S.W.3d at 342. Having reviewed all the testimony from the RCr 11.42 hearing, we are convinced his accusation is meritless. Counsel worked with the facts presented to them and while they were not required to work a miracle, enabling Phillip to emerge from a one-time capital case with a sentence of just 25 years certainly came close.

Clooney testified the viability of the facilitation defense rested entirely on Phillip's trial testimony—which was marred by his severely damaged credibility. Testifying in conformity with his statement of April 14, 2000, as he ultimately chose to do, allowed counsel to argue Phillip was in Louisville at the time of the murder but Mark had brought him there under false pretenses and the victim was alive when he left her home. While the jury knew Phillip was a liar, telling a third story would have further sullied him in their eyes.

Counsel explained Phillip's options to him, prepared him to testify as best they could by pointing out inconsistencies in his stories, and waited to hear what he would say from the witness stand so they could assess the damage and move forward. In our view, their advice was both sound and practical and we are wholly unpersuaded by Phillip's theory that the jury may have convicted him of facilitation if only he had told his third version on the witness stand. Counsel made the best tactical choices and clearly provided competent legal representation which is all that is required. *Wiggins,* 539 U.S. at 553, 123 S.Ct. 2527; *Hodge,* 68 S.W.3d at 344.

■ Phillip's final allegation is that counsel failed to investigate the evidence on which the Commonwealth intended to seek the death penalty—a handwritten list found in a journal seized from Phillip's trailer showing the figure $25,000.00 and several items with prices. The Commonwealth argued the list showed Phillip believed he was going to receive money from Mark's share of the life insurance proceeds and how he would spend it. As Clooney testified, the Commonwealth could establish Mark stood to gain from the victim's death so it was not a stretch to argue Phillip would help his brother. At the end of the Commonwealth's questioning, Phillip admitted Mark had asked him to take the fall for the murder so Mark would be eligible to receive the life insurance proceeds.

In his motion to vacate, Phillip alleged the document was a wish list of items he intended to buy with money he expected to receive from the Free Cash Grants Program. He alleges he asked his attorneys to secure papers from his mother showing he had applied for many grants, but instead they asked his wife. In light of

Phillip's mother's precarious health, we cannot fault counsel for asking April rather than Phillip's mother to locate the documentation—both were in Kokomo and lived beside one another.

Bufkin testified at the RCr 11.42 hearing that Phillip had mentioned the grant program to him, and as a result had asked April for any proof of the program she could find. No evidence that Phillip had ever applied for such a grant or had ever received money from any grant program was located. April apparently provided the defense requested documentation of something, for which Bufkin thanked her in writing, but told her its helpfulness was doubtful. Bufkin was shown a document[10] at the hearing titled "Free Cash Grants Program" but did not recall seeing it previously. Mere existence of a program is not proof Phillip submitted an application to receive a grant nor that he was even qualified to receive funds. Perhaps most telling is Phillip's failure to produce at the hearing the documents (*i.e.,* grant applications) he faults counsel for not uncovering and introducing at trial.

Phillip has not established he was deprived of any right, let alone a substantial right justifying the extraordinary relief afforded by RCr 11.42. *Dorton,* 433 S.W.2d at 118. Viewing the trial as a whole, counsel's performance was strategically sound and reasonable. Phillip was not deprived of a fair trial with a reasonable result. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

## MARK'S APPEAL

We turn now to Mark's seven allegations that his legal defense team failed to: investigate and present mitigating facts; prepare pretrial mitigation; investigate guilt phase facts and potential defenses; attack Phillip's testimony as perjury; in-

---

**10.** The document does not appear in the record.

vestigate Mark's cellphone bills; interview and secure exculpatory witnesses; and know current death penalty case law. Much of the testimony at the RCr 11.42 hearing focused on the introduction of limited mitigation evidence.

Mark was an ordained minister, retired decorated war hero and physician's assistant. He retained Olgin and Byrd several months before his arrest, agreeing to pay them $25,000.00 to represent him. Mark was their first capital client. Ultimately, Mark paid them just $12,000.00; payment waned and then ceased when his ex-wife garnished his military retirement for back child support.

From the start, Mark considered the Commonwealth's case to be weak and believed any charges against him would eventually be dropped without Phillip's testimony. Until Phillip was called to testify by the Commonwealth, Mark was confident the little brother who adored him would not take the stand. Believing he would avoid conviction entirely, Mark was uncooperative when counsel tried to prepare mitigation evidence before trial.

Olgin was an experienced criminal lawyer having spent 20 years in the JAG[11] Corps, part of that time as chief of the military's legal training division. Byrd had been practicing about four years at the time of trial. Upon meeting Mark, Olgin thought he would be the best witness ever. As the case developed, the Commonwealth's only real physical proof was Phillip's DNA under the victim's nails. While Mark assured Olgin that Phillip would not testify against him, Olgin thought Phillip would testify and believed Mark's best defense would be his exempla-

ry military record and good character. During the guilt phase of trial, Mark testified about his medical and military careers and his service awards and medals, none of which the Commonwealth challenged.

Privately, Mark, who is not a psychiatrist, told counsel he thought Phillip had mental problems for which he was receiving disability benefits. After watching Phillip interact with his defense team and seeing him testify at preliminary proceedings, Olgin and Byrd had no reason to doubt Phillip's competency, were confident any judge would find him competent, and chose not to seek a competency exam[12] for Phillip because doing so would have been a spurious motion. Olgin added that had he thought a mental health expert would have been helpful, he would not have hesitated to hire one.

When pressed about the need to follow the ABA Guidelines for Death Penalty Cases regarding mitigation evidence, Olgin stated he understood the need to collect "relevant" records and testimony, but did not request Mark's high school and college transcripts because Mark did not:

> have a deprived childhood, served the military with honor, and was approximately a 45–year–old man without a criminal record who is an outstanding citizen when he stood here accused. We felt those records would have no relevance and they wouldn't even be admissible.

Olgin testified he made a strategic decision not to prepare mitigation evidence. Byrd thought they had good mitigation evidence to offer from Mark and his family; he

---

11. Judge Advocate General's Corps.

12. During Phillip's RCr 11.42 hearing, Phillip testified he had spent two months in a mental hospital at the age of 11 and his trial attorneys had someone give him a mental evalua-tion. Phillip stated the purpose of the exam was unclear to him but he figured it was for a possible defense. This testimony was not explored further.

disagreed with Mark's suggestion that it was "thrown together."

Counsel warned Mark that Phillip was going to implicate him in the murder, but Mark was so confident Phillip would not testify against him that he ignored Olgin's advice and wrote a "fatal letter" to Phillip. Olgin met with Mark thirteen times before trial. Their shortest meeting lasted 15 minutes and their longest lasted 90 minutes. Byrd testified he met with Mark six times at the jail—mostly as trial drew closer. He reviewed all the discovery documents with Mark and rehearsed Mark's testimony, going so far as to prepare a script for him. Mark testified on direct for more than 90 minutes with little interruption.

Prior to trial, Mark had indicated that Phillip, April and his mother would all provide alibis for him for the night of the murder. As it happened, April could not be located at the time of trial; Phillip testified for the Commonwealth and placed Mark in the victim's home on the night of the murder; and Mark's mother, who was deposed, could not corroborate Mark's story that he was at Phillip's trailer in Kokomo the entire night—the most she could say was his truck was in Kokomo that night—an irrelevant fact because Phillip testified he and Mark traveled to Louisville by car and the Commonwealth never alleged they travelled by truck.

Olgin did not recall Mark providing a list of character witnesses, but if he had, Olgin testified he and Byrd would have contacted the people named. Byrd confirmed that Mark did not provide a witness list. While Mark may have suggested Olgin and Byrd speak to family members, Byrd had no specific recollection of that. Byrd also testified that Mark may have suggested some church members could appear as character witnesses.

Byrd talked to potential witnesses in Kokomo and deposed Mark's mother. He talked with Mark's ex-wife who mostly testified about the scratches Mark acquired while moving her furniture into a new home several hours before the murder. He tried to speak to Hudson, the woman who described herself as Mark's fiancé; had given birth to one of his children; and had just learned Mark was also involved with Ms. Andrew on the weekend of the murder. Hudson wanted nothing to do with Mark's defense. Byrd also spoke to the medical examiner to determine the time of death and establish a timeline for the crime. Contrary to Mark's assertion, counsel did not rely solely upon Mark and the Commonwealth's discovery. They pursued the leads Mark suggested, but these leads led nowhere.

Olgin did not consider Mark's cellphone records to be an alibi and therefore, did not hire a cellphone expert. Byrd confirmed that cellphone and tower records would not pinpoint Mark's location. On direct appeal, the Supreme Court held there was no way to authenticate a handwritten notation indicating from where a particular call had been placed since the telephone carriers had purged their records and it was unclear who had made the notation or its basis. *Bratcher,* 151 S.W.3d at 354.

Mark's first allegation is that counsel failed to adequately investigate and present mitigation evidence. We disagree. Counsel began introducing mitigation evidence during the guilt phase of trial and reiterated it during the penalty phase—despite Mark's unwillingness to discuss mitigation because he was convinced Phillip would not testify against him and he would be acquitted. Nevertheless, jurors were well aware of Mark's exceptional military career, including honors and service ribbons, and his work history, both in the ministry and in the medical field. Most of this testimony came personally

and eloquently from Mark himself, though two of his daughters also testified. Byrd testified the biggest factors that saved Mark from being sentenced to death were his prior history, clean criminal record and his daughter's testimony about the good things he had done in his life. Further testimony would have been redundant and cumulative.

Mark has not established that hiring a mitigation specialist would have revealed additional facts that would have persuaded jurors to reach a different verdict. ABA Guidelines are just that—guidelines—having neither the force nor the effect of statutory or case law. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. As further stated in *Strickland,*

> counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.,* at 691, 104 S.Ct. 2052. Counsel reasonably investigated and evaluated the case. Nothing more was required.

■ Mark's second allegation is that counsel failed to investigate the guilt phase evidence before trial. He faults counsel for not interviewing April. Byrd testified he was unable to find April to interview her before trial and she could not be located at the time of trial. Mark also did not offer testimony from her during the RCr 11.42 hearing. Mark has not established April would have provided an alibi for him. Mark also faults counsel for not introducing his mother's deposition at trial. Byrd participated in the deposition of Mark's mother, but she could not provide an ali-bi—saying only that Mark's truck was in Kokomo the night of the murder, but that was not a disputed issue. Mark did not introduce his mother's deposition at the RCr 11.42 hearing so we cannot determine whether it would have been helpful. Furthermore, based upon a letter from his mother's doctor, the accuracy of her testimony would have been questionable due to her health. We are confident counsel adequately investigated the case and properly advised Mark. Again, we see no evidence of ineffective assistance of counsel.

■ Mark's third allegation is that in light of the testimony Phillip gave during his RCr 11.42 hearing, he obviously gave perjured testimony at trial which counsel would have uncovered through more thorough investigation. We disagree. Phillip told multiple versions of the night of the murder and admitted on the stand that he lied to police. In light of his impeachment, jurors had to decide whether anything Phillip said was credible. Mark's attorneys cross-examined Phillip at trial but he persisted in repeating the statement he gave to police on April 14, 2000, as was his choice. Furthermore, this allegation is untimely because under CR [13] 60.02, an allegation of perjury must be brought within one year of a judgment's entry. Mark was convicted in 2001; he did not file his motion to vacate until 2005. We fail to see how further investigation would have uncovered the story Phillip now claims he wanted to tell at trial, but ultimately did not, or how it would have made a difference. We strongly doubt that Phillip's RCr 11.42 version of the evening's events would have resulted in Mark's acquittal since it placed him in the victim's home, kicking her in the head and pounding her head on the floor, jerking her up and throwing her into a room or closet.

---

**13.** Kentucky Rules of Civil Procedure.

Mark next alleges counsel failed to adequately investigate Phillip's competency. We cannot forget that Phillip was a co-defendant in this case and as such had constitutional and privacy rights of his own. Mark's attorneys sought Phillip's psychiatric records, but that request was denied, and we have been cited no authority establishing the trial court erred in its denial of that request. Furthermore, this is an issue that should have been raised on direct appeal,[14] but was not. *Gross,* 648 S.W.2d at 856.

Mark includes a discussion of recanted testimony in his brief. However, Phillip never recanted his trial testimony, he simply stated at his RCr 11.42 hearing that he would have told a different story at trial if his attorneys had allowed him to testify as he wished. Phillip's version of the truth developed over time as he tailored it to fit his changing circumstances. We cannot fault counsel for lacking a reliable crystal ball.

Mark next argues he is entitled to relief due to cumulative and specific error. As proof, he quotes part of his testimony from the RCr 11.42 hearing in which he said he knew the Commonwealth had no evidence against him and Olgin had indicated to him the Commonwealth's case was "weak" and "circumstantial" and would likely be dropped unless Phillip testified against him. He then alleges counsel should have hired a cellphone expert to prove he made a call from his home calling area rather than from outside his home calling area. As noted earlier, the Supreme Court has already said the trial court properly excluded proof about Mark's alleged location at the time of the phone call and we will not revisit it on collateral attack. Further-

more, Mark has not established what a cellphone expert would have said or how it would have changed the verdict. Thus, we deem counsel's actions reasonable.

Mark's next allegation is that he became indigent during the pendency of the case when his ex-wife garnished his military retirement and his defense suffered thereafter because he had no money to hire experts or pay his attorneys their full agreed upon fee. Mark has not shown his change in financial circumstances influenced his attorney's performance. To the contrary, Olgin testified he had no qualms about hiring experts he believed would advance the defense. He also testified that being paid only half of their agreed-upon fee was "part of the business" and if an expert had been needed, he would have paid for it himself or requested funds from the trial court because his client was now indigent. Byrd confirmed that he too had requested public funds for other clients he had represented but those requests were denied. Byrd testified he had used experts in other cases.

Before trial, Mark identified three alibi witnesses—his mother, Phillip and April. Byrd deposed Mark's mother, but she did not provide the complete alibi Mark said she would give. Phillip, who Mark was adamant would not testify against him, took the stand and placed Mark in the victim's home on the night of the murder. Byrd searched for April but never located her. Apparently, April had not been located at the time of the RCr 11.42 hearing either, or else her testimony was not offered because it would not have been as Mark had forecast. Byrd also interviewed Mark's ex-wife about Mark helping her move on the day of the murder. He tried

14. On direct appeal, Mark argued the trial court erroneously limited his cross-examination of Phillip about post-traumatic stress disorder. The Supreme Court disagreed, stating the trial court properly regulated cross-examination without denying Mark's right of confrontation. *Bratcher,* 151 S.W.3d at 344.

to speak with Ms. Hudson, Mark's other girlfriend, but she wanted nothing to do with Mark's defense. Thus, we must conclude that counsel reasonably investigated all of the exculpatory witnesses Mark mentioned.

■ Mark's last allegation is that Olgin and Byrd lacked sufficient training in capital cases and should have withdrawn from representing him. While Mark was the first capital client represented by Olgin or Byrd, he certainly was not their first client. Reviewing the trial as a whole, we see no error. Representing an eloquent, seemingly respectable client with no criminal history, they mounted a defense based upon his exemplary military and medical careers. Unfortunately, Phillip's DNA was found under the victim's fingernails and he changed his story upon learning this fact. As the Supreme Court stated, but for Phillip's testimony, there was little circumstantial evidence against Mark; but with Phillip's testimony, there was plenty. We cannot, and will not, fault counsel because the jury was convinced of Mark's guilt. Based upon the trial as a whole, counsel provided reasonably effective assistance of counsel. That is all that is required under *Strickland.*

### CONCLUSION

The orders of the Jefferson Circuit Court denying Phillip's and Mark's RCr 11.42 motions are AFFIRMED.

ALL CONCUR.